## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**RECEIVED**

NOV **3 0** 2007

NANCY MAYER WHITTINGTON, **CLERK**
U.S. DISTRICT COURT

GLORIA D. YELDER,

     Plaintiff,

                           Civil Action No.07-1639(RJL)

   v.

UNITED STATES DEPARTMENT OF
DEFENSE, et.al.


## MOTION

## PLAINTIFF'S STATEMENT OPPOSING DEFENDANTS' MOTION

## THAT THERE ARE NO MATERIAL FACTS TO WHICH THERE ARE

## GENUNIE ISSUES


Plaintiff, respectfully submit the statement of material and true facts that

contradicts Defendants' motion for dismissal or in the alternative summary

judgment.  There are genuine facts and issues in this case and Plaintiff asked

this Honorable Judge for the relief asked for in the initial filing.

1

1. Plaintiff was employed as a special agent with the Department of Defense, (DoD), Defense Security Service, (DSS), from September 1982 to August 1998, when her security clearance was unfairly and unjustly revoked and she was terminated from her position. DoD Regulations 5200.2-R states that an individual must be given the right to be interviewed when the information may result in adverse determination which affects an individual rights, benefits and security clearance.

2. Although the personal security function of the agency was transferred outside the Department of Defense to the Office of Personnel Management, these issues could have and should have been resolved before the transfer.

3. For over twelve (12) years, Plaintiff has tried to resolve the situation with her security clearance, before, during and after her clearance was revoked, but DSS and Washington Headquarters Services, (WHS), have used all kinds of trickeries, schemes and cover-ups to prevent Plaintiff her due process under then the Regulations of DOD, 5400.2-R and now the judicial system.

4. Plaintiff has requested all records pertaining to her, including her Periodic Reinvestigations, Statement of Reasons, as well as any

information used to revoke her security clearance and terminate her
employment.  To date, Plaintiff has not received all information.


## Search for Records And Adminstrative Remedies

5. Since March 1998, Plaintiff has requested all information pertaining
   to her security clearance, which included the second secret Periodic
   Reinvestigation, case number CCN# 96192-DXC-1812-1E3., closed
   October 3, 1996.  Both DSS and WHS have ignored her requests,
   made excuses or covered up the facts in the case.

6. Before Plaintiff's security clearance was revoked and before she was
   terminated, Plaintiff requested the information about her security
   clearance investigation from DSS and WHS.

7. Three months after Plaintiff was terminated and fifteen days after she
   filed her formal EEO complaint with the agency, she received for the
   **first time** from Leslie Blake, Director of the Freedom of Information
   Office, DSS, partial and tampered information which included an
   email about an alleged affair.  The email reflected the following:

From:  John P. Edwards at D15HQ

Date:  12/13/95

Subject:  Request for Information (OIG#C95-098)

---------------------------------------Message Contents---------------------------
-------

Mr. John Benson has requested an inquiry into a citizen's complaint that she
was being harassed by s/a Gloria D. Yelder, D41HV w/ duty stationat
Birmingham, AL.  Apparently there is/was a relationship between Yielder
and complaintant's spouse.  If you have pertinent info pls advise. Thanks.
**Exhibit 1**

8.  Plaintiff appealed the decision to the Director of DSS.

9..After receiving the new information about the December 13, 1996 email,
Plaintiff sent a letter to WHS along with the email, asking them to clarify
what Plaintiff was accused of per her Periodic Investigation dated October 3,
1996 by DSS.

10.  WHS' letter, dated January 11, 1998, stated, "Several of the questions
you asked in your letter (#1, 2, 3, 4, 6, 10, 13 and 14) deal with the contents
and processing of your investigation by the Defense Security Service, (DSS).
These questions should properly be posed to that agency and so I will not
address them**. Exhibit 2.**

11. DSS and WHS have refused to allow Plaintiff the right to review all the information used to revoke her security clearance and terminate her employment, although the information used was regarding her.

## Information That Contradicts The Information Filed by the Defendant and Leslie Blake's Declaration to The Court.

12. **For the first time**, in December 2004, the court ruling stated that Plaintiff was well aware of the allegations of an affair and the effects on her security clearance and termination of employment. (**Exhibit 3**, Excerpts from case #04-PWG-1032S, page 7, paragraph7, sentences 1, 2, 3, US District Court for the Northern District of Alabama)

13. In May 2005, Plaintiff found out that Defendant stated that they were well aware that Plaintiff was unaware of the investigations regarding her when she filed her EEO complaints or during the pendency of her security clearance process. (**Exhibit 4**, Excerpts from case #04-CLS-1032S, Defendant's Motion 60 Response, page 2, paragraph 2, US District Court for the Northern District of Alabama)

14. In July 2005, Plaintiff requested all information pertaining to her security clearance.

15. On August 11, 2005, by letter, Leslie Blake stated Plaintiff could appeal the decision about the information to the Director of DSS.

16. On September 6, 2005, Plaintiff appealed the decision to the Director.

17. Plaintiff stated, "I am appealing the response to my request for information per your letter dated August 11, 2005. Please be advised this information has been in court litigation since 2000 and I could not believe that your office would get rid of information pertaining to my security clearance and investigations. I am requesting all hard copies of those records. I look forward to your immediate response."**(Exhibit 5)**

18. On September 14, 2005, RE: #134-25 (Appeal) This is to acknowledged receipt of your letter dated September 6, 2005, in which you appeal the decision of the DSS, Office of FOIA/PA,......"Your request will be processed in accordance with the provisions of the FOIA and upon completion a written response will be forwarded to you. We must inform you that due to a significant number of pending FOIA/PA actions, a final response determination within the statutory time period (20 days) may not be possible. Signed Leslie Blake, Chief, FOIA/PA. **(Exhibit 6)**

19. Plaintiff did exhaust all her administrative remedies before she brought the complaint to the attention of your Honor's court.

20.  In November 2005, through counsel, Roland Meisner, attorney, filed a response to Plaintiff's complaint in US Court of Appeal, 11th Circuit.  The response stated "The chain of events began after receipt of the December 13, 1995 email message and ended with Ms. Yelder's removal in August 1998. **(Exhibit 7**, Excerpts from case #05-11616A, page 16, US Court of Appeals, 11th Circuit).  At that time DSS had the other investigation.

21. In December 2006, when Plaintiff could not receive a response from DSS, she requested, she sought the help of Senator Richard Shelby and Congressman Autur Davis.

22 .By letter, dated January 19, 2007, Congressman Davis, DSS informed Congressman Davis that I must contact the Privacy Act Branch of DSS, 938 Oak Elkridge Landing Road, Linthicum, Maryland and WHS at the Pentagon. **(Exhibit 8)**

23. In January 2007, Plaintiff contacted DSS and WHS by certified mail, requesting all documents pertaining to her security clearance.  **(Exhibit 9)**

24. WHS acknowledge that they were searching for the files, but the majority of the records were with DSS, so they sent a request to DSS for them to respond to me.  **(Exhibit 10)**

7

25. In March 2007, by certified mail, Plaintiff requested again records from DSS. Again her requests were ignored. **(Exhibit 11)**

## TWO PERIODIC REINVESTIGATIONS

26. DSS conducted background investigations for security clearance, including their own employees. After conducting the investigation, the investigation was sent to WHS for adjudication. Background Investigations are retained for 15 years after the investigation.

27. WHS stated that Plaintiff's investigation closed October 3, 1996, disclosed the information about the email and an alleged affair with the spouse complaining to DSS and other information. (See above, paragraph # 10)

28. The email about the alleged affair was given to Plaintiff three months after she was terminated, which indicated DSS knew the information existed and never disclosed it to her.

29. The Periodic Re-investigation that DSS continues to disclose to Plaintiff has no information about an alleged affair. **(Exhibit 12)**

30. Periodic Investigations are assigned to Teams and Controllers (A-Z). The case controller for the first periodic investigation is 96192-DXO-1812-

1b3, with the "O' changed to "C" with ink.  This Case was assigned to Team X and Controller O.

31. The second periodic reinvestigation is 96192-DXC-1912-1E3.  The case was assigned to Team X and Controller C, two different individuals/controllers.  **(Exhibit 13)**

32. The 96192-DXO-1812-1b3 was conducted by MD Jones.  His initials would be the bottom of the page one (1) instead of RAM's initial, who is Robert Minchin.  (See **Exhibit 1&**, page 1 of the investigation)

33. MD Jones was located in Ft. Rucker, Al.   Robert A. Minchin was located in Atlanta, GA.

34. Cases were electronically sent from the PIC Headquarters and they would not be typed.  The case control numbers are never in lower caps.

35.  In a letter, dated October 23, 2007, WHS sent many documents to Plaintiff.  Some of the document she has never seen before.

36.  The letter stated "The Washington Headquarters Service, Human Resources Directorate provides the enclosed documents in response to your request.  However, additional material that they located falls under the cognizance of DSS and the United States Department of Justice.  Accordingly, we sent that material to them at the addresses provided below,

with the request that they respond directly to you." **(Exhibit 14)** (Volumes 4, 5, 7, 9, 11, and 14 and any documents after 15.)

37. Records of WHS reflect that Amy Brown, Counselor for DSS, had these documents in 2001.

38. This concludes that the Defendants, DSS forwarded records to WHS and they used the information against Plaintiff to revoke her security clearance. Plaintiff still has not received these records. DSS and WHS concealed information from Plaintiff and never allowed her to see, refute or examine the information before her security clearance was revoked and she was terminated from her employment.

39. Because the refusal to allow Plaintiff due process in the revocation of her security clearance and termination of employment have caused Plaintiff much pain and suffering. Pain and suffering that was not necessary.

40. Plaintiff has presented documentation that disputes Defendant's motion for dismissal, or in the alternative summary judgment. Therefore, Defendant's motion for dismissal and summary judgment should be denied and Defendants finally be made to produce all records pertaining to Plaintiff's background investigation for her security clearance.

Respectfully submitted,

Gloria D. Yelder, pro se

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing motion with exhibits to deny Defendants'

summary judgment/ dismissal have been mailed to the Defendant on

November 27, 2007 by certified mail, first class postage to

Michelle N. Johnson,
Counselor for Defendants
U. S. Attorney's Office
555 Fourth Street
Washington D. C. 20001

Submitted by,

Gloria D. Yelder, pro se

11

*Telephone call from complaining Spouse*

u  ::  John P. Edwards at DISHQ7
ate:    12/13/95  10:33 AM
ubject: Request for Information (OIG#C95-098)
------------------------------------ Message Contents ------------------------------------

Mr. John S. Benson has requested an inquiry into a citizen's
complaint that she was being harassed by S/A Gloria D.
Yelder, D41HV w/duty stationat Birmingham, AL.  Apparently
there is/was a relationship between Yelder and complainant's
spouse.  If you have any pertinent info pls advise. Thanks.



*Spouse — name of spouse that complained.*

*Exhibit 1*



**DEPARTMENT OF DEFENSE**
**WASHINGTON HEADQUARTERS SERVICES**
1155 DEFENSE PENTAGON
WASHINGTON, DC 20301-1155

(Clearance Appeal Board)                                    1 1 JAN 1999

Ms. Gloria D. Yelder
1807 Eufaula Ave.
Birmingham, AL 35208

Dear Ms. Yelder,

        This is in reply to your December 22, 1998 letter regarding the revocation of your
Department of Defense security clearance.

        Several of the questions you asked in your letter (# 1, 2, 3, 4, 6, 10, 13 and 14) deal with the
content and processing of your investigation by the Defense Security Service (DSS).  These
questions should properly be posed to that agency and so I will not address them.  In other questions
(#5, 7, and 8) you ask why Washington Headquarters Services believed that a psychological
evaluation was necessary, and why your security clearance was revoked.  These issues have been
discussed with you several times already, both telephonically and in voluminous correspondence.
While it is clear and understandable that you do not agree with our explanations, it is also clear that
any further attempts to explain them will be futile.

        In question 11 you state that you would like the psychologist whom you hired for a
psychological evaluation to look at the files, in order to "understand the nature of the issues" that
raised concerns about your continuing security eligibility.  You have now, as you did at the time of
the evaluation, all of the files in question and are free to share them with the psychologist if you
choose.

        Question 15 states that page 15 of the Administrative Judge's recommendation is missing.
Enclosed is another copy of that document.  It turns out there is no page 15.  The Judge's discussion
concludes on page 14, and the last page was incorrectly numbered "16" rather than "15".

        I hope that this addresses your concerns.  I also hope that you understand that you have taken
full advantage of the Department's due process procedures provided for a clearance revocation and
there will be no further review of this matter.

                                            Sincerely,

                                            *Janet Thompson*

                                            Janet E. Thompson
                                            Director

Enclosure as stated
*w/o enclosure*
                    *gn.*



                                            Exhibit 2

22 December 98

From: Gloria D. Yelder
1807 Eufaula Avenue
Birmingham, Alabama 35208

To: A. L. Papenfus, Director
    Department of Defense
    1155 Defense Pentagon
    Washington D. C. 20301-1155

Dear Mr. Papenfus:

After just receiving new information about my investigation from Defense Security, (DSS), help me clarify what I am accused of per your investigation dated 03 Oct 96.

  1. Name all parties involved in an alleged affair?

  2. Name the people I was alleged to have harassed?

  3. Please list the acts that constituted , "the disturbing pattern of behavior presented in the report", as per letters to Senators Shelby and Sessions. In your 23 Oct 98, correspondence to me you used as an example: letters and telephone calls. What are the other harassing behavior?

  4. Do you have any recorded tape of my voice harassing her?

  5. What in the 03 Oct 96 report led Washington Headquarters Services to think my judgment and mental state would cause a concern in the interest of national security?

  6. In the 03 Oct 96 investigation, does it talk about anyone posing in explicit pictures? If so, who is the people in the photographs?

  7. As stated in your 13 Oct 98 communication, "At no time was a determination made that your were unstable:, based on the above statement and the information received from DSS, I am unclear as to the reason for revoking my clearance, even in Oct 97.

  8. What would make you ask me for a medical evaluation? As you know this woman was having an extramarital affair with my boyfriend, so what make her so righteous and me so wrong. I would think that with all the things this woman and

*Exhibit 2*

this man did to me, you would think that I was one special person. Even now, when WHS and DSS is not here to protect their reputation and with the explicit pictures still in my possession, I have not done anything to hurt either one of them at their jobs or in their homes.

9. I was an investigator too long to know, that as I said before I did not send any letters or telephone her about her affair, but if I did this would not cause my clearance to be revoked.

10. The timing of my revocation of my security clearance concerns me. There was a significant time lapse between Dec 95, when Ms. Whitfield contacted my supervisors until Feb 98, when my clearance was revoked. Without resolving what ever issues there were, I continued working, receiving an exceptional evaluation, four cash awards and I remained in the top three in productivity. It eludes me, as to how I was able to do all of this, and WHS and DSS revoked my clearance.

11, You stated to Senators Shelby and Sessions, that I did take the mental evaluation but the psychologist based her findings on my own report of the incident and the evaluation was inadequate to resolve the questions raised by my behavior. You went on to state that I did not correctly characterize for the psychologist the nature of the issues, which raised concerns about me continuing security eligibility. Since I was never told what the nature of the issues were, how could I explain them to the psychologist?   For the benefit of the psychologist and mine, I would like for her to look at the files.

12. You also stated to Senators Shelby and Sessions, there was only one investigation used to revoke my security clearance. The security clearance I have is a good clearance. All of my references were asked about my mental state and none of them stated I had any mental problems. They also informed the investigator about this woman, Whitfield and my relationship with Green.

13. Why was I also asked to take a polygraph examination since I had proven that this woman was having an affair with my boyfriend? And also I received anonymous letters and telephone calls.

14 Who is the agent who conducted my investigation in my 03 Oct 96 periodic re-investigation?

15. Also please be advised that page 15 was missing from the judge's report.

I know you do not have to answer any of my questions. I feel that I was never given due process by DSS and WHS. Everyone in DSS and WHS took the word of Whitfield and Green and I, who was an agent for 16 years, had no credibility. I could accept all of this if it was true. I have been fired from my job and my reputation damaged. It is hard to explain in an interview why you were fired after

Exhibit 2

16 years of service and you have been labeled a person lacking in judgment and no one tells you the reason why.

Any assistance would be appreciated.  Thanks in advance.

Sincerely,

*Gloria D. Yelder*

Gloria D. Yelder

FILED

2004 Dec-21 PM 02:44
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| GLORIA YELDER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO.  04-PWG-1032-S |
| | ) |
| DONALD RUMSFELD, Secretary, Department | ) |
| of Defense; PHILLIP D. BOWLING, in his | ) |
| individual capacity, | ) |
| | ) |
| Defendants. | ) |

## MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDATION

Gloria Yelder (hereinafter referred to as Plaintiff), filed this complaint and an amended complaint against the United States Department of Defense, Donald Rumsfeld, and Phillip Bowling alleging a violation of Title VII of the Civil Rights Act of 1964 as amended by the Civil Rights Act of 1991, violation of 42 U.S.C. § 1981, violation of the Plaintiff's Fifth Amendment right to due process and for defamation of character and violation of 42 U.S.C. § 1983.  Defendant Bowling's Motion to Substitute the United States as Sole Defendant (doc. #9) pursuant to the Federal Torts Claim Act, 28 U.S.C. § 2679(d)(1) is hereby GRANTED.  This matter is before the court for the consideration of the Defendant's Motion to Dismiss or, in the alternative, Motion for Summary Judgment (doc. #6) and supplement thereto (doc. #16) pursuant to Rules 12(b)(6) and Rule 56 of the Federal Rules of Civil Procedure.

Summary judgment is appropriate only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law.  Rule 56, *Federal Rules of Civil Procedure*.  In making that assessment, the court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving party.  *Celotex Corp. v.*

*Exhibit 3*

conclusions that allegedly substantiate the investigation." (Exhibit A at ¶ 83) and that "Bowling initiated an 'anonymous' complaint over an affair." (*Id.* at ¶ 84). The Plaintiff was well aware of the allegations of an affair and its effect on her security clearance, and her termination of employment. She may not now allege defamation as a new legal theory of recovery.

The Plaintiff's Complaint in the previous lawsuit and the current Complaint allege exactly the same wrong by the Defendant. The fact that the Plaintiff has added a new cause of action does not prevent *res judicata* from acting as a bar to the Plaintiff's other causes of action. Because the defamation claim presents another ground of recovery arising from the same set of facts, *res judicata* operates as a bar to that claim as well. Therefore, since all four elements of *res judicata* are present in this case, all of the Plaintiff's causes of actions are barred by *res judicata* and the Defendant is entitled to summary judgment as a matter of law.

Based on the foregoing the magistrate judge RECOMMENDS that Defendant's Motion for Summary Judgment (doc. #6) and supplement thereto (doc. #16) be GRANTED.

The parties are DIRECTED to Rule 72(b), *Federal Rules of Civil Procedure*.

The clerk is DIRECTED to serve a copy of this order upon counsel for the parties.

As to the foregoing it is SO ORDERED this the 21st day of December, 2007.

PAUL W. GREENE
CHIEF MAGISTRATE JUDGE

at 4
nd



May. 17. 2005 5:07PM

FILED

2005 May-18  PM 03:37
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF ALABAMA

### SOUTHERN DIVISION

GLORIA YELDER,

    Plaintiff,

v.

DONALD RUMSFELD,
Secretary, Department of Defense;
PHILLIP D. BOWLING, in his
individual capacity

    Defendants.

CIVIL ACTION NO.
04-CLS-1032-S

## RESPONSE TO PLAINTIFF'S RULE 60 MOTION.

    Plaintiff filed a Motion for Relief of Judgment Pursuant to Rule 60(b). The Plaintiff argues that under Rule 60(b)(2)(3) and (6) the Court should grant relief from judgment.

Rule 60(b) states, in pertinent part, that:

> On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons:...(2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b);(3) fraud (heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party;. . . or (6) any other reason justifying relief from the operation of judgment.

## I.  Timeliness

    Initially, Defendants note that Plaintiff's motion is untimely. Rule 60(b), Fed.R.Civ.P., provides that motions seeking relief under sections (2) and (3) must be filed within one year of the

Exhibit 4

May. 17, 2005  5:07PM

judgment or order at issue. While Plaintiff couches her motion as if she were attacking the dispositive order in the present case, in effect, she is once again challenging Judge Nelson's dispositive order entered on February 5, 2002 in the previous civil action. The present motion was filed years thereafter and is, therefore, untimely.

Moreover, although there is no one-year limitation with regard to relief under section (6), such motions "shall be made within a reasonable time. . . ." Rule 60(b)(6), Fed.R.Civ.P. The Plaintiff failed to seek the relief requested in present motion within a reasonable time after the prior dispositive order. Accordingly, the Plaintiff's Motion is due to be dismissed on that basis.

II.    **Merits**

    A.    **Legal Standards**

        1.    **Rule 60(b)(2)**

To prove a basis for relief under Rule 60(b)(2), a party must demonstrate that (1) the evidence is newly discovered since the judgment was entered; (2) due diligence on the part of the movant to discover the new evidence has been exercised; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) the evidence is such that is likely to produce a new outcome if the case were retried, or is such that would require the judgment to be amended. Taylor v. Texas Corp., 831 F.2d 255, 259 (11th Cir. 1987). With regard to the Motion for Relief in the present case, there has been no showing of the discovery of new evidence.

Plaintiff argues that the Defendant never provided the plaintiff all of the information to which she was "entitled" to defend her case when she filed her EEO complaints or during the pendency of her security clearance investigation. (Pl. Motion Pg. 4). This is not new evidence. The Plaintiff actually cites to her deposition in the 2000 case filed before Judge Nelson to show that she did not

2

September 6, 2005


Gloria D. Yelder
1807 Eufaula Avenue
Birmingham, Alabama 35208

Director, DSS
Attn: FOIA Appeal
1340 Braddock Place
Alexandria, Virginia 22314-1651

Dear Director:

I am appealing the response to my request for information per you letter dated August 11, 2005.  Please be advised this information as been in court litigation since 2000 and I could not believed that your office would get rid of information pertaining to my security clearance and investigations.  ]

I am requesting all hard copies of these records.  I look forward to your immediate response.

Sincerely,

Gloria D.Yelder

Exhibit 5



**DEFENSE SECURITY SERVICE**
1340 BRADDOCK PLACE
ALEXANDRIA, VA 22314-1651

Ms. Gloria D. Yelder                                  **SEP 1 4 2005**
1807 Eufaula Avenue
Birmingham, Alabama 35208

RE: FOIA# 134-25 (Appeal)

Dear Ms. Yelder:

This is to acknowledge receipt of your letter dated September 6, 2005, in which you
appeal the decision of the Defense Security Service (DSS), Office of FOIA/PA, which
informed you it had located no Inspector General, Administrative Inquiry, DSS Security,
or EEO records responsive to your FOIA request.

Your request will be processed in accordance with the provisions of the FOIA and upon
completion a written response will be forwarded to you. We must however inform you
that due to a significant number of pending FOIA/PA actions, a final response
determination within the statutory time period (20 days) may not be possible.

Your request will be processed in a multitrack processing system, based on a first-in,
first-out concept. If you can demonstrate to this office a compelling need for the
information within the next 30 days, DSS may consider expedited processing. Enclosed
is an information sheet on what constitutes a compelling need.

Additionally, please be aware that DSS still maintains records pertaining to your
Personnel Security Investigations (PSIs), which were previously release to you. As
indicated in our August 11, 2005, response to your FOIA request, should you want a
second copy of these PSI records, you should contact this office via email with your
request. To date, DSS is not in receipt of any such request from you for these records.

Sincerely,

LESLIE R. BLAKE                                        Enclosure
Chief, FOIA/PA
Office of General Counsel

Exhibit 6

No. 05-11616-AA

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

## GLORIA YELDER,

Plaintiff/Appellant,

vs.

## UNITED STATES DEPARTMENT OF DEFENSE,

Defendant/Appellee.

On Appeal from the United States District Court
For the Northern District of Alabama
Southern Division

## BRIEF OF APPELLEE

**ALICE H. MARTIN**
United States Attorney
Northern District of Alabama

**JENNY L. SMITH**
Assistant United States Attorney

Attorneys for Appellee
United States Attorney's Office
1801 Fourth Avenue North
Birmingham, Alabama 35203-2101
(205) 244-2001

Exhibit 7

| Topic | Paragraphs in Complaint in 1st Civil Action | Paragraphs in Complaint in 2nd Civil Action |
|---|---|---|
| Lost Promotional Opportunity and Use of Government Vehicle | 86-96 | 218-26 |

(R1-8, Exs. 1 & 6) Thus, Ms. Yelder added allegations to a number of previously raised topics and added one topic concerning defamation of character.

The Department removed Ms. Yelder in August 1998. (R1-1-30 at ¶ 199) She filed her first civil action on February 24, 2000. (R1-6, Ex. 1) None of the allegations in the complaint filed in her second civil action concerned actions or inactions occurring after February 24, 2000. With regard to the only new category of factual allegations, the defamation allegations, the chain of events began after receipt of a December 13, 1995 email message and ended with Ms. Yelder's removal in August 1998. (R1-1 at ¶¶ 206, 208, 212) Thus, that claim could have been raised in the first civil action as it occurred during the relevant time frame and involves the same underlying events that led to Ms. Yelder's removal.[1]

Additionally and alternatively, with regard to the newly raised defamation

_____

[1] In her second post-judgment motion in the first civil action (R1-6, Ex. 4 at 15-16), Ms. Yelder raised claims concerning fraud and inappropriate conduct by her former attorney comparable to those she raises now. (Appellant's Brief at 13-14) These claims are not relevant to the res judicata analysis except to the extent that they were actually litigated, and this Court affirmed the district court's decision denying relief on that basis. (Id. at Ex. 5)

16

**ARTUR DAVIS**
7TH DISTRICT, ALABAMA

208 CANNON HOUSE OFFICE BUILDING
WASHINGTON, D.C. 20515
(202) 225-2665
Fax (202) 226-9567
www.house.gov/arturdavis

COMMITTEES
COMMITTEE ON FINANCIAL SERVICES
COMMITTEE ON THE BUDGET



# Congress of the United States
## House of Representatives

January 19, 2007

Mrs. Gloria Yelder
1807 Eufaula Ave
Birmingham, AL 35208

Dear Mrs. Yelder:

Thank you again for contacting my office for assistance regarding your security clearance. This is a follow up letter informing you of the status of your case.

We have contacted the Department of Defense Services on your behalf and per your request. According to their procedures, in order to obtain a copy of your investigation records, you must send a written request to the Privacy Act Branch of the Defense Security Service. Please send your request to Defense Security Services, Attn: Privacy Act Branch, 938 Oak Elkridge Landing Road, Linthicum, Maryland 21090-2917. In making your request please include your full name, SSN, and a brief statement requesting a copy of your investigation records, along with your notarized signature. They will be glad to provide you with this copy.

Also, you made reference to not receiving information regarding the denial for your security clearance. In order to receive a copy of these records you must contact the Washington Head Quarters Services, which is the office that revoked your security clearance. You may contact them at Department of Defense, Washington Headquarters Services, 1155 Defense Pentagon, Washington, D.C. 20301-1155. After you have written these offices, please allow a reasonable time-window for a response. If you do not receive a response from either or both of these offices, please contact our office immediately and we will make an inquiry on your behalf. Please feel free to contact my Constituent Services Representative, LaWanda Ross, at my local office in Birmingham at (205) 254-1960, if you have further questions.

Sincerely,

*Artur Davis*

**Artur Davis**
Member of Congress

BIRMINGHAM OFFICE
2 20TH STREET N, SUITE 1130
BIRMINGHAM, AL 35203
(205) 254-1960
FAX (205) 254-1974

TUSCALOOSA OFFICE
TUSCALOOSA COUNTY FEDERAL COURTHOUSE
1118 GREENSBORO AVENUE, SUITE 336
TUSCALOOSA, AL 35401
(205) 752-5380
FAX (205) 752-5899

LIVINGSTON OFFICE
205 NORTH WASHINGTON STREET
UWA STATION 40, WEBB HALL, SUITES 236-237
LIVINGSTON, AL 35470
(205) 652-5834
FAX (205) 652-5935

SELMA OFFICE
908 ALABAMA AVENUE
FEDERAL BUILDING, SUITE 112
SELMA, AL 36701
(334) 877-4414
FAX (334) 877-4489

DEMOPOLIS OFFICE
102 EAST WASHINGTON STREET
SUITE I
DEMOPOLIS, AL 36732
(334) 287-0860
FAX (334) 287-0870

THIS STATIONERY PRINTED ON PAPER MADE OF RECYCLED FIBERS

*Exhibit 8*

January 21, 2007


Gloria D. Yelder
1807 Eufaula Avenue
Birmingham, Alabama 35208
(205) 781-3454


Defense Security Service
Attn: Privacy Act Branch
938 Oak Elkridge Landing Road
Linthicum, Maryland 21090-2917
Certified Mail


To Defense Security Service:

I am Gloria Dean Yelder, DOBP: April 30, 1954, Prattville, Autauga, Alabama, SSN: 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. I was a special agent with the Defense Security Service, (DSS), Department of Defense from Sept 1982 to August 1998, before my security clearance was revoked and I was terminated from my employment. I have recently found out that my security clearance was revoked due to an alleged affair and that I was supposedly well aware of the effects of the alleged affair on my security clearance and termination from employment.

Please be advised that I have never been interviewed, told nor have I received the above mentioned information or investigations, especially while I was a special agent with DSS. I am requesting all information pertaining to my **security clearance, including Periodic Reinvestigation, (PR), Case Controller Number 96192-DXC-1817-1E3, as well as any investigations or information pertaining to my security clearance.** I am well aware that Washington Headquarters Services revoked my security clearance, but it was DSS, my former employer, who conducted the investigations.

I have received letters from my Congressman, Artur Davis and my senator, Senator Richard Shelby stating that DSS would be more than happy to finally provide the above mentioned PR that caused the revocation of my security clearance and termination from employment. As an US citizen, I deserved the right to defend myself before any information was placed in my security clearance and made public, no matter who placed the information in my security clearance. This never happened within DSS.

*Exhibit 9*

I look forward to your immediately response within twenty (20) days of receipt of this letter. If I am unable to get my records I was informed that I needed to come back to Congressman Davis and Senator Shelby's offices for assistance.

Thanks in advance for your cooperation. I hope we will be able to resolve this as soon as possible.

Sincerely,


Gloria D. Yelder



UNITED STATES POSTAL SERVICE

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4 in this box •

Gloria D. Yelder
1607 Eufaula Ave
Bham AL 35208

SENDER: COMPLETE THIS SECTION

■ Complete items 1, 2, and 3. Also complete
item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse
so that we can return the card to you.
■ Attach this card to the back of the mailpiece,
or on the front if space permits.

1. Article Addressed to:

PSS
Attn: Privacy Act
Branch
9380 Oak Elkridge
Landing Rd
Linthicum MD 21090

COMPLETE THIS SECTION ON DELIVERY

A. Signature
X                                    ☐ Agent
                                     ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery
                                   1 2 8

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
   ☐ Certified Mail      ☐ Express Mail
   ☐ Registered          ☐ Return Receipt for Merchandise
   ☐ Insured Mail        ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
   (Transfer from service label)

PS Form 3811, February 2004    Domestic Return Receipt    102595-



**DEPARTMENT OF DEFENSE**
**OFFICE OF FREEDOM OF INFORMATION**
**1155 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1155**

FEB 0 6 2007

Ref: 07-FP-0075

Ms. Gloria D. Yelder
1807 Eufaula Avenue
Birmingham, AL 35208

Dear Ms. Yelder:

This is in an interim response to your January 21, 2007, Freedom of Information/Privacy Act (FOIA/PA) request seeking "all information pertaining to my security clearance, including Periodic Reinvestigation, (PR), Case Control Number 96192 DXC-1817-1E3, as well as any investigations or information pertaining to my security clearance." We received your request February 1, 2007.

The Washington Headquarters Service, Human Resources office is searching for documents responsive to your request. However, the portion of your request concerning the Defense Security Service (DSS) falls under the control of DSS. Accordingly, we sent your request to them at the address provided below with the request that they respond directly to you. There are no assessable fees for this response in this instance.

Defense Security Service
Chief FOIA and Privacy
1340 Braddock Place
Alexandria VA 22314-1651

Sincerely,

Will Kammer
Chief

Exhibit 10

March 11, 2007


Gloria D. Yelder
1807 Euafaula Avenue
Birmingham, Alabama 35208
(205) 613-6680
(205) 781-3454



Defense Security Service
Attn:  Privacy Act Branch
938 Oak Elkridge Landing Road
Linthicum, Maryland 21090-2917
Certified Mail

To Whom It May Concern:

Please be advised that I wrote to DSS, Privacy Office over thirty (30) days ago in
reference to information pertaining to my security clearance.  It appears again that DSS
continues to ignore my request and have not acknowledged when I may received the
information about my security clearance.  To date, DSS has never taken responsibility for
the problems they had caused in my life. Not only has DSS destroyed my career, but my
reputation has been eminently damaged due to the fraudulent information in my security
clearance that was given to Washington Headquarters Services, (WHS), without my
knowledge and participation.

I have tried to resolve whatever issues that were placed in my security clearance without
my knowledge and participation for over eight years, but DSS and WHS continue to deny
my due process during the revocation stages of my security clearance, especially while I
was a special agent with DSS.

I had hope for resolution of this issue before we have to go back to court, Congress or to
the news media.  I look forward to your response in ten (10) days of receipt of this letter,
if not you leave me no choice but to take the above means of resolution.

Regards,



Gloria D. Yelder




Exhibit 18

UNITED STATES POSTAL SERVICE

29 JAN 2007 PM 5

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

102595-02-M-1540

• Sender: Please print your name, address, and ZIP+4 in this box •

Gloria D. Yelder
1807 Eufaula Ave
Bham Al 35208

SENDER: COMPLETE THIS SECTION

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

DSS
Privacy Act
9380 oak Elkridge Rd
Landrly Rd
Linthicum, MD 1090

COMPLETE THIS SECTION ON DELIVERY

A. Signature
X [signature]                  ☑ Agent
                               ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery
   [illegible]                   3/4/07

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:       ☐ No

3. Service Type
   ☐ Certified Mail      ☐ Express Mail
   ☐ Registered          ☐ Return Receipt for Merchandise
   ☐ Insured Mail        ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
   (Transfer from service label)    7006 0760 0005 0884 6289

PS Form 3811, February 2004        Domestic Return Receipt

 **DEPARTMENT of DEFENSE**
**DEFENSE INVESTIGATIVE SERVICE** 

FILE NO:

YELDER GLORIA DEAN
F 422-76-797C        54/C4/3C C1
SE152-DXC-1817-183

**DEFENDANT'S
EXHIBIT**
_YELDER_

# WARNING

THIS FILE IS THE PROPERTY OF THE DEFENSE INVESTIGATIVE SERVICE. CONTENTS MAY BE DISCLOSED ONLY TO PERSONS WHOSE OFFICIAL DUTIES REQUIRE ACCESS HERETO. CONTENTS MAY NOT BE DISCLOSED TO THE PARTY(S) CONCERNED WITHOUT SPECIFIC AUTHORIZATION FROM THE DEFENSE INVESTIGATIVE SERVICE.

SPECIAL INSTRUCTIONS:

It is certified that the material in this file is being retained pursuant to DoD Directive 5200.27, DIS Regulation 20-2 and DIS Manual 28-2.

Date Acquired _____    Signature _____

RETAIN FOR: | 60 Days | 1 Year | 15 Years | 25 Years | Permanent |

FOR OFFICIAL USE ONLY

DIS Form 3
85 Feb

Previous edition will be used until exhausted.

**RETENTION CONTROL SHEET**

Exhibit 12

DOD REQUEST FOR PERSONNEL SECURITY INVESTIGATION

Form Approved
OMB No. 0704-0384
Expires Sep 30, 1998

Public reporting burden for this collection of information is estimated to average 15 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to Department of Defense, Washington Headquarters Services, Directorate for Information Operations and Reports (0704-0384), 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302.
PLEASE DO NOT RETURN YOUR COMPLETED FORM TO THIS ADDRESS. RETURN COMPLETED FORM TO ADDRESS IN ITEM 16.

| 1. CODE | 2. REQUESTER FILE NUMBER (Optional) | 3. DATE OF REQUEST (MM/DD/YY) | 4. THIS REQUEST IS FOR (X one) | | |
|---|---|---|---|---|---|
| D41HV-B | | JUL 3 1996 | | a. SINGLE SCOPE BACKGROUND INVESTIGATION (SSBI) | |
| | | | X | b. PERIODIC REINVESTIGATION (PRI) | |

| 5a. FROM | 5b. TO | | c. SPECIAL INVESTIGATIVE INQUIRY (SII) | |
|---|---|---|---|---|
| Defense Investigative Service Office of Security (VC0060) ALEXANDRIA, VA 22314-1651 | | | d. EXPANDED NATIONAL AGENCY CHECK (ENAC) | |
| | | | e. OTHER (Specify in Remarks) | |

| 6. DO YOU DESIRE ADVANCE NOTICE OF NAC RESULTS (X one) | | YES | | NO | X |
|---|---|---|---|---|---|

7. STATUS (X as applicable)

| | a. ACCESS TO CLASSIFIED MATERIAL (X one) | |
|---|---|---|
| | CONFIDENTIAL | SECRET X |
| | TOP SECRET | |

8. SUBJECT OF INVESTIGATION

| a. NAME (LAST, First, Middle Name) (Last name in ALL CAPITALS) | b. SOCIAL SECURITY NUMBER |
|---|---|
| VELDER, Gloria Dean | 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 |

| c. MAIDEN NAME |
|---|
| N/A |

| d. OTHER NAMES USED OR KNOWN BY |
|---|
| N/A |

| b. CRITICAL NUCLEAR WEAPON POSITION | |
|---|---|
| c. LIMITED ACCESS AUTHORIZATION (LAA) | |
| d. SENSITIVE COMPARTMENTED INFORMATION (SCI) | |
| e. SIOP-ESI | |
| f. PRESIDENTIAL SUPPORT | |
| g. CRITICAL SENSITIVE POSITION/DUTIES | X |
| h. ADP-1 | |
| i. NATO ASSIGNMENT | |
| j. CRYPTO/COMSEC | |
| k. SPECIAL ACCESS PROGRAM (SAP) | |
| l. OODEP | |
| m. OTHER (Explain in Remarks) | |

| e. DATE OF BIRTH (MM/DD/YY) | f. PLACE OF BIRTH (City, County, State and Country) | g. SEX |
|---|---|---|
| 04/30/54 | Prattville, AL | Female |

| 9. U.S. CITIZENSHIP VERIFIED (X one) | a. YES X | c. VERIFICATION DOCUMENT REVIEWED |
|---|---|---|
| | b. NO | |

10. LOCAL FILES VERIFICATION/PRE-SCREENING INTERVIEW

| TYPE (X as applicable) a. | DATE REVIEWED CONDUCTED (MM/DD/YY) | FILES VERIFICATION - UNFAVORABLE INFORMATION REVEALED (X one) c. | |
|---|---|---|---|
| | | YES | NO |
| X (1) PERSONNEL | 04/16/96 | | |
| X (2) SECURITY | 04/18/96 | | |
| (3) MEDICAL | | | |
| (4) BASE/MILITARY POLICE | | | |
| (5) AUTHORIZED PRE-SCREENING INTERVIEW | | | |
| (6) OTHER | | | |

11. PRIOR INVESTIGATION (X a, b, or c)

| | a. YES (Type, Date, By Whom, and File Number) | X |
|---|---|---|
| | b. NO | |
| | c. UNKNOWN | |

| 12. TITLE OR POSITION OF SUBJECT (If military, list rank and service; if U.S. Government employee, list grade; and if contractor employee, list job title.) | 13. TS BILLET NUMBER |
|---|---|
| GS-1810-11 | |

| 14. ENCLOSURES (Please list. Use continuation sheets, if necessary.) |
|---|
| SF 86 |

15. RETURN RESULTS TO: (Read instructions before completing this item.)
WASHINGTON HDQTRS SVC
CAF
CRYSTAL SQUARE 2, SUITE 212A
1725 JEFFERSON DAVIS HIGHWAY
ARLINGTON, VA 22201

FOR DIS USE ONLY

| CCN (Case Control Number (1 - 16) | |
|---|---|
| 96192 DxC 1817 | 1E8 |
| (16 - 22) DVa | |

| PB (72 - 73) | PC (74 - 76) |
|---|---|
| Q1 | DP |

| SV (76) | CR (77 - 78) |
|---|---|
| U | GS |

| R | Q | I | N |
|---|---|---|---|

DIS CLOSING STAMP

Anthony L. Stolz, Jr.
Director, PIC

COMPLETED
OCT ...

DATE COMPLETED

Investigations conducted on Army, Navy, and Air Force military personnel must be returned only to the parent service for adjudication regardless of the source of the original request.

DD FORM 1879, SEP 95

PREVIOUS EDITION IS OBSOLETE.
FOR OFFICIAL USE ONLY (When filled in)

Page 1 of 4 Pages

DIS PERS

**16. REASONS(S) CLASSIFIED INFORMATION OR INVESTIGATION IS REQUIRED** *(Justification of eligibility; warranting access/ investigation. Contractors must list contract number.)*

**17. HISTORY OF GOVERNMENT EMPLOYMENT AND/OR CURRENT MILITARY SERVICE INDICATED ON ATTACHED SF 85P/SF86 IS** *(X one)*

| | | | | | |
|---|---|---|---|---|---|
| X | a. CORRECT | | b. PARTIALLY CORRECT *(Explain in Remarks)* | | c. COULD NOT BE VERIFIED *(Explain in Remarks)* |

**18. REMARKS** *(Use continuation sheet(s), if necessary.)*

CONDUCT EMPLOYMENT RECORDS
CHECK AT V0972.

**19. INVESTIGATION VALIDITY CERTIFICATION**
I certify that the information provided on this form is true to the best of my knowledge and that the above named individual has the need for the indicated clearance to perform assigned duties.

| a. TYPED NAME OF CERTIFIER *(Last, First, Middle Name)* | b. TITLE OF CERTIFIER |
|---|---|
| PASCAL, TERESA B. | ASSISTANT CHIEF, OFFICE OF SECURITY |

| c. SIGNATURE OF CERTIFIER | d. DATE SIGNED BY CERTIFIER *(MM/DD/YY)* | e. TELEPHONE NUMBER *(Include Area Code)* |
|---|---|---|
| Teresa B. Pascal | JUL 3 1996 | (703) 325-5359 |

**20. EMPLOYEE'S IMMEDIATE SUPERVISOR'S CERTIFICATION**

| | |
|---|---|
| X | I am aware of adverse information concerning the individual named on the front of this form. |
| | I am not aware of any adverse information concerning the individual named on the front of this form. |

*If you are aware of adverse information, you must reflect that information in the space below. Use continuation sheets, if necessary. Complete items 20.a. through 20.f.*

**a. ADVERSE INFORMATION** *(If none, indicate "None.")*

An administrative inquiry was conducted by the SE Region concerning allegations of mis-use of government property (Cellular phone). There are additional allegations of mis-conduct and this investigation is still on going.

| b. IMMEDIATE SUPERVISOR *(Last, First, Middle Name)* | c. TITLE |
|---|---|
| SPARKMAN, Joseph F. | Team Chief, D41HV-B |

| d. SIGNATURE | e. DATE SIGNED *(MM/DD/YY)* | f. TELEPHONE NUMBER *(Include Area Code)* |
|---|---|---|
| Joseph F. Sparkman | 05 29 96 | (205) 895-5280 |

| FROM | | DATE |
|---|---|---|
| Defense Investigative Service<br>Personnel Investigations Center<br>P.O. Box 454<br>Baltimore, MD  21203-0454 | | OCTO3    |

| TO | |
|---|---|
| | YELDER GLORIA DEAN<br><br>F 422-76-757C<br>S6192-DXC-1617-1E3   54/C4/3C CI |

## NOTICE

THIS DOCUMENT, ACCOMPANYING REPORTS AND ATTACHMENTS ARE THE PROPERTY OF DIS. CONTENTS MAY BE DISCLOSED ONLY TO PERSONS WHOSE OFFICIAL DUTIES REQUIRE ACCESS HERETO. CONTENTS MAY NOT BE DISCLOSED TO SUBJECT OR COUNSEL WITHOUT SPECIFIC AUTHORIZATION FROM DIS. THIS TRANSMITTAL DOES NOT CONSTITUTE A DENIAL OR GRANTING OF CLEARANCE. FOLLOWING COMPLETION OF FINAL ACTION THIS FORM, ACCOMPANYING REPORTS WITH ATTACHMENTS AND ALL REPRODUCTIONS SHOULD BE DESTROYED. IF ADVERSE ACTION IS TAKEN AS A RESULT OF DIS INVESTIGATIVE ACTIVITY ADVISE: INVESTIGATIVE FILES DIVISION, PERSONNEL INVESTIGATIONS CENTER, DIS, P.O. BOX 1211, BALTIMORE, MD. 21203-1211.

### ITEMS CHECKED ARE APPLICABLE

Results of investigation are attached. This matter is ☐ pending  ☐ closed.

Results of prior investigation, copy attached, should satisfy current requirements.

DIS/DCII records reflect NAC/ENTNAC completed favorably on _____ .

OPI Form 79 was submitted to OPM.

✓ Prior file no. __89234DXX18191E3__ completed by __DIS__ attached.

Prior file no. _____ completed by _____ attached.

Reply received reference file no. _____ indicated:
- ____ No information pertinent to your inquiry.
- ____ File destroyed/missing.
- ____ File does not pertain to Subject.
- ____ Adjudicative material only.

**REMARKS:**

DEPARTMENT OF DEFENSE - DEFENSE INVESTIGATIVE SERVICE

| D41AT | REPORT OF INVESTIGATION | DATE: 23 Aug 96/236 |
|---|---|---|

CCN:            96192-DX6-1817-1b3
LEAD(S):        I:96194

STATUS:         RUC
MADE BY:        S/A M.D. Jones, 0041;0257
DISTRIBUTION:

COPY TO:

SUBJECT: YELDER GLORIA DEAN /SPECIAL AGENT, DIS
SEX: F  SSN: 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  DOB: 30 APR 54  POB: 01 (ALABAMA)

WARNING: This document is the property of the Defense Investigative
Service. Contents may be disclosed only to persons whose official
duties require access hereto. Contents may not be disclosed to the
party(s) concerned without specific authorization from the Defense
Investigative Service.

INVESTIGATIVE RESULTS
THE RECORD CHECKS AND INTERVIEWS, AS APPROPRIATE, WERE FAVORABLE AND
INTERVIEWEES RECOMMENDED SUBJECT FOR A POSITION OF TRUST, UNLESS
OTHERWISE INDICATED.

EMPLOYMENT REFERENCES
1. Curtis A. Massey, Jr., Special Agent-Defense Investigative Service
(DIS), with three times weekly contact as friend and coworker from May
84 to Apr 92; biweekly personal and twice weekly telephone contact as
friend and coworker from Apr 92 to present, including once to twice
yearly social contact, provided information concerning a DIS
INVESTIGATION. He recommended Subject for a position of trust.

  DIS INVESTIGATION
  An investigation was conducted after a woman made allegations that
Subject was harassing her. They were both dating the same man. Subject
received a Letter of Reprimand (LOR) concerning the investigation. He
does not know all of the details. The situation has not affected
Subject's work.  (06 Aug 96)

FIMS2            RAM            RAM 

Page: 1

F O R    O F F I C I A L    U S E    O N L Y

96192-DXC-1817
YELDER GLORIA DEAN

2. Joseph F. Sparkman, DIS Team Chief (TC), D41HV Field Office, (D41HV) advised that he has known Subject since 1982. He has had the following contacts: monthly as work associate from Sep 82 to Apr 93; weekly contact (telephone or personal) as supervisor from Apr 93 to Oct 93; monthly contact as work associate from Oct 93 to Dec 94; and weekly contact as supervisor from Dec 94 to present provided information concerning a COUNSELING STATEMENT (CS) and a LOR.

CS

In 1995, Yelder was issued a CS concerning, among other items, investigative work, Local Agency Checks/Court Records (LAC/CT) and an Ex-spouse interview. Yelder had in a report indicated that she could not contact an ex-spouse. He (Sparkman) made two calls to the number provided and, on his second attempt, talked to the ex-spouse, who agreed to be interviewed. Yelder, during the counseling session, advised that she had called and had talked to a man, who told her that the person she was looking for did not reside there.

Yelder had in other reports reflected only partial information concerning a LAC/CT check and in one case wrote off a check as a No Record. Complete information was obtained later by other agents. Yelder submitted a letter in response to the above in which she advised that she reported what was provided to her or what was told to her by court personnel.

Sparkman advised that he sent out about 200 Courtesy Letters concerning Yelder and that all that were returned were favorable. He does not believe that Yelder would falsify a report.

Also included in the CS is information concerning an incident which occurred during a 1995 TDY trip, by Yelder, to the Pensacola Field Office. He provided a copy of the letter, dated 09 Jun 95, concerning the counseling. Also provided were copies of two letters concerning the TDY trip and a copy of Yelder's letter, dated 09 Jun 95, concerning the counseling session. These letters are appended as Attachment 1.

LOR

On 08 Jul 96, Yelder was issued a LOR. This was the result of a DIS Investigation which had been conducted after another woman had accused Yelder of harassing her through telephone calls and written correspondence. Review of the LOR reflected that Yelder had declined to acknowledge receipt of the letter (did not sign and date the LOR) and that a copy had been provided to her.

The LOR concerned an off duty personal situation involving Yelder, another woman (identified in the LOR as Andrea Whitfield), and a man (identified in the LOR as Alvin Q. Green), who they were both dating.

The other woman had filed Complaints with the Police Department, against Yelder, concerning telephone calls and written correspondence which she

96192-DXC-1817
YELDER GLORIA DEAN

had received. Sparkman advised that, during a visit to D41HV, Yelder said: how do they know I wrote letters, if I did not sign them. In an undated memo addressed to Sparkman but received in the same envelope with another memo dated 18 Jul 96, Yelder denied making such a statement.

The LOR also references telephone calls made on a DIS issued cellular telephone. Sparkman advised that Yelder was not asked to pay for the calls.

Yelder has also been counseled concerning her use of her US Government AMEX card to make purchases at a department store and at a local restaurant. When questioned about the card use, Yelder at first advised that she had thought that she could use it as she was going TDY (had not been TDY and was not scheduled to go at that time) and then advised that she had gotten it mixed up with her other card. She paid for the card charges.

Complete details are included in the LOR. Sparkman provided a copy of the LOR and copies of Yelder's two memos. They are appended as Attachment 2.

Sparkman further advised that: Yelder was told to have no further contact with Whitfield. The D41HV Special Agent in Charge (SAC) told him that Whitfield had contacted DIS again as Yelder had called her again and said: watch you back and that she had pictures of her daughter. The writer spoke (telephone) to the D41HV SAC and he could not recall the exact time (before or after date of the LOR) that this contact occurred.

Yelder always has a reason or excuse for things that have happened. Yelder will discuss anything with her friends and is telling others her side of the above situation. He believes that Yelder has talked to an attorney about this but no attorney has contacted DIS. He is not aware of any other police problems. There have been no noticeable changes in Yelder's emotional/mental stability, her reports are about the same. He is not aware of her seeking any professional help.

Sparkman advised that the information above and that contained in the LOR makes him question Yelders' character and reliability. He advised that if Yelder is Guilty, he could not recommend her for a position of trust.  (07 Aug 96)

DEVELOPED REFERENCES
3. Robin H. Griffin, Magistrate, 708 Roberta Circle, Birmingham, AL 35214 with once to twice weekly contact as friend from 1988/1989 to present provided information concerning a PERSONAL SITUATION. She recommended Subject for a position of trust.

    PERSONAL SITUATION

96192-DXC-1817
YELDER GLORIA DEAN

Subject used to date a man, who seemed like a nice guy at first. Subject learned that he was also dating another woman, who was married. Griffin thinks that he was dating the other woman for a period of time before he started dating Subject. Subject got out of the relationship. Subject received letters, she saw one of the letters that Subject had received. Subject also received telephone calls. The calls were from the other woman, the other woman's sister, and the other woman's husband. She told Subject not to talk to them. She told Subject to file a report concerning this but does not know if Subject did so.

The other woman contacted DIS and made accusations that Subject had been harassing her. Subject is not that type of person. Subject is a "forgiving person" and is a person of good character. She helps elderly friends. One is a retired school teacher, who Subject takes shopping and to the grocery store. Subject baby-sits for her (Griffin) at times when she has to work during night court sessions. (07 Aug 96)

4. Donnie F. Flint, Postal Employee, 881 7TH Place West, Birmingham, AL 35204 advised that she met Subject in the mid 1970s, when Subject and her sister were in school together. She has kept contact with Subject over the years and has had once to twice weekly contact as friend from 1987 to present. (06 Aug 96)

5. Glory G. Abercrombie, Output Review Clerk, 801 12TH St West Birmingham, AL 35208 advised that she has known Subject for 25 years. They were college students together for four years at Tuskegee University. She had weekend contact from 1978 to 1982 and has had several times weekly contact as friend from 1982 to present, provided information concerning an INVESTIGATION. She recommended Subject for a position of trust.

INVESTIGATION
An investigation was conducted concerning an off-duty personal problem. She does not if a decision has been made but no action has been taken against Subject. Subject is a stable levelheaded person. Subject has talked to her friends about the problem. Subject has not sought any professional counseling as a result of the investigation. (06 Aug 96)

NEIGHBORHOOD INVESTIGATIONS
6. Leroy L. Williams, Retired Steel Worker, 1811 Eufaula Ave, Birmingham, AL 35208 with almost daily contact as neighbor from 1984 to present. (06 Aug 96)

7. Myra J. Tarver, Teacher, 1735 7TH Ave West, Birmingham, AL 35208 (also LCR)(7TH Ave intersects Eufaula Ave) with varied contact (two to four times weekly) as friend and neighbor from Jul 84 to present. (06 Aug 96)

LOCAL AGENCY CHECKS

8. Police Department, Birmingham, AL (PDBA). (NOTE: RECORDS REFLECTED NO WARRANTS OF ARREST REPORTS CONCERNING YELDER.)

9. Alabama Criminal Justice Information Center (ACJIC), Montgomery, AL., repository for all felony and misdemeanor arrests for the State of Alabama. (I/A RK Stoddard, 0257) (12 Aug 96)

10. National Crime Information Center through ACJIC. (0257) (12 Aug 96)

SUBJECT INTERVIEW

12. An interview of Subject was conducted on 06 Aug 96 as part of a PERIODIC REINVESTIGATION. This interview required 85 minutes. Subject is currently a DIS Special Agent assigned to D41HV with duty in Birmingham, AL. Subject provided information concerning COUNSELING, LOR and FOREIGN TRAVEL.

COUNSELING

In 1995, she received COUNSELING from her SAC. This counseling session included an incident which occurred during a 1995 TDY assignment at Ft. Walton Beach, FL. In an attempt to contact a military member to schedule a Subject Interview, she called his home; he was not home; she talked to his wife; she called his home again the next week; and again talked to his wife. Later, the military member called her and asked her why she had upset his wife. Another Sergeant also called her and was yelling and screaming at her and she hung up on him. She told the subject of the investigation to call her supervisor. Another person with the last name of Holler, who she does not know and never talked to, advised DIS that she (Yelder) had called him and the subject of the investigation at a TDY location. She did not do so as the subject called her. She gave the investigation back to an agent at Ft. Walton Beach. She called the SAC in Pensacola, FL and told him about the situation. In early 1996, during another inquiry, she was told that she had been rude to Holler. She again advised that she had never talked to him

LOR

DIS conducted an investigation in early 1996. This was the result of a personal conflict. A person called her supervisor and she got into trouble. The other person also filed Complaints with the PDBA. No warrants were signed/issued and she has never been arrested. As a result of the investigation, she was issued a LETTER OF REPRIMAND by her SAC. She did not want to go into details of the situation as it is still pending. She has submitted a rebuttal. (NOTE: Per instructions received by the writer, this situation was not pursued as it had all ready been investigated.)

FOREIGN TRAVEL

She listed travel to the Bahamas in 1993. This was a four day cruise.

F O R    O F F I C I A L    U S E    O N L Y

96192-DXC-1817
YELDER GLORIA DEAN

During the interview, she advised that she was going on leave from 7-11 Aug 96. She was going to San Antonio, TX and had planned a one day trip to Mexico.

Subject responded with only favorable information to questions posed about her conduct (including use of alcohol or drugs), school attendance, activities, associates and personal finances. The questioning developed no criminal conduct, nor any mental problems or treatment, and the responses raised no questions of judgment or reliability. Subject's comments indicated she is loyal to the United States; and reported for herself, family and associates, no involvement in or advocacy of force to overthrow the U. S. Government, or the use of force or violence to deny others their constitutional/legal rights. Subject denied any personal knowledge of the unauthorized disclosure of classified information, the illegal transfer of U. S. technology, or involvement with any hostile intelligence activity directed against the United States. Subject provided information about her family activities, associates and personal life, none of which disclosed any adverse or questionable areas indicative of her susceptibility to coercion, pressure, or blackmail to act against the United States.

Subject was completely cooperative, responded to all questions without hesitation, and expressed no reservations about the holding of a security clearance.

ATTACHMENTS
(1) Four letters re: counseling.
(2) LOR and two memos.

******************** E N D   O F   D O C U M E N T ********************

MFR - 09 JUNE 1995

SUBJECT:   COUNSELLING SESSION - S/A G D YELDER

1.  Recent events have dictated that SAC Phillip D. Bowling and T/C
Joseph F. Sparkman call S/A G D Yelder into the Huntsville Field
Office   to   discuss   apparent   deficiencies   in   S/A   Yelder's
investigative techniques and required note taking procedures.

   a)   Dec 94 - S/A Yelder conducted a LAC/CT check on a Subject
and reported minimal details only.  The leads she conducted were
not scoped to her, rather, they were assigned to be worked on a TDY
basis.  When an agent was dispatched to this area to conduct the
requested LAC/CT checks, he obtained full details on the case.
This was the first noted incident and was discussed with S/A Yelder
by T/C J E Griffis.  No further action was taken at that time as it
was felt to be an isolated case of a records clerk not providing
information.

   b)   Feb 95 - S/A Yelder attempted a LAC/CT check in Demopolis,
AL, to obtain details and disposition on a listed charge of Issuing
Worthless Checks with no specific date listed.  S/A Yelder wrote
off the check as a No Record.

        As details and disposition were not obtained on the initial
check, the case was held in abeyance pending the next TDY trip to
this remote area.  That TDY was accomplished in May 95 and the
agent  conducted  the  Subject  interview  and  also  went  to  the
Demopolis area to attempt a records check.  Again, this attempt was
successful with full details of the arrest/charges being obtained
and reported.

        In an effort to determine why one agent obtained information
which  was  written  off  by  S/A  Yelder,  the  Demopolis  Police
Department/Municipal Court was contacted by T/C Sparkman.  Sparkman
talked with the clerk referenced in S/A Yelder's rough notes who
indicated that she conducted records searches for a limited time
frame only (92 to present) and also advised Sparkman that she
refers inquiries to other local sources for records prior to that
time.  The records clerk did not specifically recall talking with
any representative from DIS.  (Note:  A DIS agent had been there
less than two weeks prior and did obtain records.  S/A Yelder's
notes reflect only the records clerk name and N/R in four different
areas.)

   c)   On a recent TDY trip to the Pensacola Field Office, S/A
Yelder  attempted  an  education  records  check  for  Troy  State
University with attendance at Hurlbert Field, FL.  This lead was
written off with a lead dispatched by S/A Yelder to the main campus
in Troy, AL.  Again, this lead was not assigned to S/A Yelder,
rather, it had been assigned to the I/T in Pensacola who later
successfully completed the education records review locally.

(Note: SAC Crongeyer advised the undersigned of this and indicated that TSU leads are sometimes difficult to obtain but the information is there if you know the proper questions to ask of the clerk.)

d) In May 95, S/A Yelder wrote off an ex-spouse interview as she was "unable to locate" the reference. T/C Sparkman then made two telephone calls to the number which was indicated in S/A Yelder's notes as the POC for the ex-spouse. On the second attempt, T/C Sparkman was able to talk with the former spouse who indicated that she would be happy to talk with one of our agents in person. (Note: S/A Yelder indicated, during the counselling session, that she had also talked with a man at the referenced number who told her that the former spouse she was asking about did not live there. S/A Yelder's notes reflect only "could not locate" with no explanation of what transpired or what steps were attempted.)

e) S/A Yelder was also apprised of two complaint letters which were received against her which were a result of her recent TDY trip to the Pensacola Field Office. S/A Yelder indicated that she called the spouse of the investigative Subject on two occasions only because the Subject did not respond to her first request that he call her. Yelder also indicated that she conferred with a local agent on this technique prior to attempting to contact Subject through a home number. Yelder denied any conduct which could be construed as harassing in nature.

However, Yelder did admit to hanging up on Subject's supervisor who called her at her room at 2230 hours to complain of her trying to contact Subject through his spouse. Yelder advised that she tried to explain to the supervisor what she was doing but that he "would not listen". Yelder also indicated that she provided the individual with supervisory points of contact for any complaints and admitted to hanging up on the supervisor when it was apparent that she and he were not getting anywhere.

f) S/A Yelder was also apprised of the need to insure that her use of standard paragraphs needs to be appropriate and totally accurate. This was prompted as a standard DCR write off was used which indicated that DCR'S were attempted in "neighborhood investigation". The case in question had a recent neighborhood which was in the D41HV area but out of S/A Yelder's area. No attempts were made in this neighborhood nor was a lead dispatched to the agent who handles the area in question.

2. Any one of the events could and would be construed as an isolated incident worthy of a drop file item to be reviewed with an agent during the course of a rating period. However, taken as a group, especially considering the short time span of the above events, these incidents would indicate that this counselling session and some additional informal training need to take place to insure that S/A Yelder is taking the proper investigative steps and recording same in her agent notes.

During this counselling session, all the above incidents have been addressed with S/A Yelder and different scenarios discussed as to any reason(s) for the above discrepancies. S/A Yelder indicated that all information made available to her was reported and that there is no specific reason for records custodians to withhold information from her. S/A Yelder was also given examples of follow on questions to ask a records custodian in the event that no record can be located when other investigative paperwork would indicate that such a record should exist.

T/C Sparkman will also conduct a ride along with S/A Yelder within the next month as a coaching tool to insure S/A Yelder's performance is at or above a Fully Successful level.

S/A Yelder has also been informed that her agent notes must show all investigative steps and that they will be kept in a manner which is in conformance with the DISM 20-1.

3.    The above incidents are unfortunate, in that, extra investigative efforts have been unnecessarily expended and in some of the instances the image of DIS has been lessened. However, I believe the steps above and continued training will eliminate the problem(s) and allow S/A Yelder to perform her investigative duties in a proficient and professional manner.


PHILLIP D. BOWLING
SAC, D41HV

Attachments
S/A Yelder's written response
Case files re: above incidents
Complaint letters re: D41PF TDY


COMMENTS:
We did not just hang up the phone. I told the 1st Sgt, that I could not get over the information to him so there was no further conversation.
Again, Joe Sparkman and anyone else are free to ride with me at any time

S/A GLORIA D. YELDER
RECEIPT ACKNOWLEDGED

00 Jun 95

This is in reference to the discussion I had with Phil Bowling and Joe Sparkman.

In Dec 94, I conducted a court check at the Bibb County Circuit Court, Centreville, AL. When I was there I asked the clerk, not the same one I deal with, information about a record on an individual. She gave me the information and told me there were no other details. I wrote the case up and sent it in.

When on TDY in Demopolis, AL, I conducted a records check. I was told there was no record. The person checked the individual and could not locate the records. In return I wrote the lead off as a negative record.

I conducted a case for s/a CA Massey to do an ex-spouse. I called the number he gave me and the man who answered the phone told me that the ex-spouse did not live there and he did not know her. I called Massey in return and inform him of this. I wrote the lead off.

In reference to a record check conducted in Ft. Walton Beach, FL, where I was TDY. I went to the Troy State University's office in FL and they informed me that records had been sent to Troy State University in Troy, AL. I sent a lateral lead for them to do the inter record check.

~~inxxxfxexxxxxxxxxxxxxxxixxxxxxxxxxxxxx~~

In references to two letters that was written about a my conduct while TDY at Huibert Field, FL. I was never rude ~~ofxaffixxxxxffxxxe~~ or offensive to anyone. I called suby Subject to set up an interview. His spouse answered the phone and I asked to speak to him. She said he was not at home. I ~~aksed~~ asked her to have him call me when he get home. When he did not return my phone call, I called him the next week and asked again to speak to him. Subject later called my room and asked me why did I call his home. I informed him that I needed to set up a interview with him. He got very upset that I called his home. He said he had never heard of ~~an a~~ Subject interview. Later his 1st Sgt called and he was very rude. I told him that I would give the case back to the ~~agne~~ agent and he could do the interview. I informed the SAC in Pensacola of the incident as soon as it happened.

I was asked why do I think these incidents happened so many times in the last six months. My answer is I really do not know. I do know that I have not deliberately been writing anything off.

In the incidents at the courts, I asked the right questions. I asked in Bibb County were there any additional records. She told me no.

When I was in Demopolis, I asked the person at the courts did they have any additional records, she said no.

As far as the ex-spouse if concerned, I did call and I was told that the person do not live there.

As far as the two letters are concerned I am not a rude person nor have I ever been. I stand on my conviction that I did nothing wrong when I asked for Subject.

It was in applied that maybe something is going on in my life that would cause me to be negligent. My personal life has nothing to do my my professional life. I know on the surface I may not be doing my job, but I know I have not done anything wrong.

Anyone can feel free to ride with me and observe my daily working habits. They will be the same at anytime.


Gloria D. Yelder
special agent

MEMO FOR RECORD

12 MAY 95

On 11 MAY 95, an interview of Robert L. Holler, SMS, USAF, residing at 57 Mooney Road, Fort Walton Beach, FL, was accomplished in connection with a neighborhood inquiry on a background investigation. After the interview, Holler related that he wished to provide the following information concerning very unprofessional behavior exhibited by S/A Gloria Yelder (not further identified) earlier in the week: Yelder had telephonically contacted one of Holler's subordinates prior to contacting Holler. During a subsequent conversation with this subordinate, Holler discovered Yelder had been very rude and pushy to the subordinate's wife when she first attempted to contact him and was told that he was on a TDY assignment. Yelder was then very demanding and rude to Holler's subordinate when she telephonically contacted him at his TDY location to arrange for an interview, even though he tried to accommodate Yelder by suggesting a telephonic interview. Yelder ended up hanging up on him. Yelder then telephonically contacted Holler at the same TDY location. Holler also tried to explain to Yelder that they were not available for a personal interview at that time but would be willing to be interviewed telephonically or in person at a later date, but Yelder was very demanding and rude to Holler and hung up on him as well. Holler stated that he reported the above information to his supervisor. Holler provided no further relevant information concerning this matter.

*Allan E. Overton*

S/A ALLAN E. OVERTON
DEFENSE INVESTIGATIVE SERVICE

MEMO FOR JIM CRONGEYER (EYES ONLY)

10 May 95

Jim,

The following information was provided me by SMS Cathy Tagert, AFSOC/Security Police, via telephone:

Tagert received a telephone call from Maj Cline, Director of Operations of the 720th Special Tactics Squadron, HF. He stated that a spouse of one of his enlisted personnel called him on the 9th of May 95, with the following: The spouse had received a telephone call from S/A Gloria Yelder regarding a security investigation on her husband. Yelder asked the spouse if Subject was home. The spouse told Yelder that Subject was TDY to a classified location and would not return for several weeks. Yelder then asked for a telephone number or a way she could contact Subject. The spouse told Yelder to contact the 720th Duty Officer for any information concerning her husband. According to the spouse, Yelder became very rude, wanted to know why she could not obtain Subject's location. The spouse told Yelder again, contact the Squadron Duty Officer. The spouse stated that Yelder then stated in a very rash and rude tone of voice that she (Yelder) would get the information she needed to conduct her investigation in her own way and she did not like the way she (Yelder) was being treated regarding Subject's location. After Yelder's call, the spouse did contact her husband through the communication center at the Squadron, telling him what happened. Subject then contacted Yelder at the Eglin Inn, telling Yelder that he could not be contacted or interviewed at this time and she (Yelder) should contact his Squadron for information. Subject told Maj Cline that Yelder was very rude and stated to him that she would conduct her investigation any way she wanted to in order to obtain the required information. (Subject stated that Yelder wanted to obtain information from him at this time but he told Yelder that the communications link would not allow any futher contact.) Subject told Maj Cline that Yelder was very rude and harsh during the conversation and could not understand why she could not obtain the information she wanted. At no time did Yelder contact Maj Cline or the Squadron Duty Officer. Another NCO in the unit told Maj Cline he tried to talk to Yelder about the Subject Interview, but Yelder was very rude to him. He just wanted to know why Yelder could not understand that interviewing Subject now was impossible. He said Yelder hung up on him.(End of Tagert's conversation.)

Jim, this is all second hand information. I don't know if the same story can be told more than once as it really occurred.

Jerry

EYES ONLY



**DEFENSE INVESTIGATIVE SERVICE**
SOUTHEASTERN REGION, HUNTSVILLE FIELD OFFICE
150 WEST PARK LOOP, SUITE 300
HUNTSVILLE, AL  35806-1744

Reply to
Attn of: D4HHV

July 8, 1996

SUBJECT:    Letter of Reprimand

TO:    Gloria D. Yelder

1.  This letter constitutes an official written reprimand for your actions as outlined below within the provisions of Defense Investigative Service (DIS), Regulation 11-752, "Disciplinary and Adverse Actions."  References made to sworn statements and observations refer to those contained in the Report of Administrative Inquiry, completed on April 0, 1996, by Mr. Matthew A. Zerylnick, Senior Special Agent, DIS, Atlanta, Georgia, Investigative Field Office and Ms. Linda J. Howes, Deputy Director of Investigations, DIS Southeast Region.

2.  On December 11, 1995, a woman identifying herself as Ms. Andrea Whitfield, called Mr. James E. Griffis, Team Chief, DIS, Huntsville, Alabama, Investigative Field Office (D4HHV), to complained about your conduct.  Ms. Whitfield accused you of harassing her via telephone calls and written correspondence, due to her relationship with a former boyfriend of yours, Mr. Alvin Q. Green.  Ms. Whitfield advised that she had already filed an incident report with the Birmingham, Alabama, Police Department (BPD).  The BPD informed Ms. Whitfield that in order for her to get a restraining order against you, she would first need to swear out a warrant.  She advised the BPD that she would first attempt to stop your unwanted contact by addressing the matter with DIS.  Following receipt of Ms. Whitfield's complaint, Mr. Zerylnick and Ms. Howes were assigned to conduct an administrative inquiry into Ms. Whitfield's allegations.

3.  On December 18, 1995, Ms. Whitfield was interviewed by Mr. Zerylnick to gain additional information concerning her complaint.  Ms. Whitfield disclosed that she had once been involved in an extramarital affair with Mr. Green.  Ms. Whitfield went on to explain that she and Mr. Green had maintained a platonic friendship following the 1994 termination of their romantic relationship.  She advised that in approximately February 1995, she began to receive telephone calls at her home from an unidentified female.  This female would advise her that she was being watched, and that she should leave Mr. Green alone.  Ms. Whitfield also received several telephone calls wherein the caller would disconnect without ever speaking.  Ms. Whitfield assumed these calls were also being made by the same unidentified female.  Ms. Whitfield's efforts to trace these calls to their source were unsuccessful, and she was advised that the offending party was either calling from a cellular telephone or they had initiated a block on their telephone line prior to calling her home.
Ms. Whitfield also provided Mr. Zerylnick copies of a letter postmarked February 29, 1995, which she had received from an anonymous source, identified only as "a concerned friend."  The letter advised Ms. Whitfield that Mr. Green had a nice, sweet girlfriend who appeared to make him happy.  It also informed Ms. Whitfield that she was being watched and warned her to leave Mr. Green alone or her husband would be informed of her prior infidelity.  When Ms. Whitfield brought this letter to the attention of Mr. Green, he informed her of your disclosure that you, too, had received an anonymous letter.  Ms. Whitfield asked him to retrieve a copy of the letter you claimed to have received, which he

did. When she noticed that your letter bore no postage stamp or postmark, she became suspicious that you were the author of both letters. On March 6, 1995, Ms. Whitfield filed a report with the BPD accusing you of "Harassing Communications" (HC), which is a misdemeanor offense in the State of Alabama. Ms. Whitfield also described an incident on March 8, 1995, when she met with Mr. Green at his home to discuss the preceding events. She advised that a short while after her arrival you appeared at the residence in a "rage" ringing the bell and beating on the door. She advised that while she was attempting to explain to you the nature of her relationship with
Mr. Green, you "attacked" her, and that during the scuffle she suffered a bite on the arm.
Ms. Whitfield stated that she continued to receive calls following this incident, and on several occasions the caller informed Ms. Whitfield's husband that his wife was having an affair with
Mr. Green. Ms. Whitfield again received a letter from "A concerned friend post marked June 2, 1995, which she believes you authored due to the nature of the information it contained. In December 1995, Ms. Whitfield's husband and mother both received letters from "A Concerned Friend." Her husband threw his away; however, Ms. Whitfield obtained a copy of her mother's letter. The letter informed her mother that Ms. Whitfield was involved in an extramarital affair with
Mr. Green. On December 11, 1995, Ms. Whitfield resolved to initiate more serious action against you by filing a compliant with the BPD concerning the incident occurring on March 8, 1995.
Ms. Whitfield was advised by the BPD that she would be required to swear out an arrest warrant against you, if she wanted to obtain a restraining order. Because she did not want to take the matter to court, she decided to address her concerns to DIS. Ms. Whitfield advised that her last physical contact with you occurred on the evening of January 29, 1996, while she was visiting Mr. Green.
Ms. Whitfield recounted that you and she engaged in a verbal altercation after you arrived at the residence in an agitated state.

On May 15, 1996, Ms. Whitfield left two messages for Mr. Zerylnick, advising that she had mailed correspondence to DIS and requested that DIS forward any response to her place of employment, rather than her home. On May 16, 1996, Mr. Zerylnick received two additional messages from Ms. Whitfield advising that you had returned some pictures to Mr. Green, and apologized for all of the problems you caused everyone. Ms. Whitfield then stated that DIS should ignore the correspondence which she had already mailed. On May 24, 1996, Mr. Zerylnick received a letter from Ms. Whitfield informing him that on May 1, 1996, you called her school's principal
(Ms. Whitfield is employed as a school teacher). Ms. Whitfield's letter alleged that you informed the principal she was engaged in an extramarital affair, and offered to show him various pictures to prove it. Ms. Whitfield also accused you of again calling her principal on May 3, 1996, and her husband on May 6, 1995, leaving your name and number on both occasions. Ms. Whitfield's letter advised that she was tired of your conduct and was addressing the matter to the District Attorney, as well as the offices' of both the County and City magistrate. Ms. Whitfield stated that she intended to hold DIS liable for having knowledge of your using DIS telephone "facilities" to engage in harassment. She then requested that DIS return all original letters supplied by her in the administrative inquiry to be used as evidence.

4. On December 19, 1995, Mr. Green was questioned regarding the above information. He advised that you and he had been romantically involved from the Summer of 1994, through October 1995.

2

Mr. Green disclosed that in March 1995, both he and Ms. Whitfield received letters from "A Concerned Friend" accusing them of being romantically involved. He went on to confirm Ms. Whitfield's assertion that in March 1995, you bit her arm during a physical altercation at his home. Mr. Green disclosed that he received a number of subsequent letters from "A Concerned Friend" most of which he threw away without reading. Mr. Green advised that he is uncertain who the author of these letters is; however, based on the knowledge of detail they contained, along with the fact that he only started receiving them after he met you, he had no choice but to suspect you as being the actual source. This information was incorporated in a statement dated December 19, 1995. On January 4, 1996, Mr. Green contacted Mr. Zerylnick requesting that he be allowed to retract his earlier statement, because he did not feel it was proper for Ms. Whitfield to have addressed this matter with your supervisor. On January 31, 1996, Mr. Green was contacted by Mr. Zerylnick following Ms. Whitfield's advisement of a January 29, 1996 altercation she had with you at Mr. Green's home. Mr. Green confirmed that on January 29, 1996, you came to his house while Ms. Whitfield was there and that you and Ms. Whitfield talked amongst yourselves for several minutes. Mr. Green informed Mr. Zerylnick that he did not witness yelling or foul language; however, because he had left the room he was unaware of the specific content of your discussion.

5.  A review of Bell South statement of charges for the mobile telephone number (205) 515-1420, which was assigned to you by DIS, reflects that from January 1995 to December 1995, a total of 13 calls were placed by this phone to (205) 323-3124, which is Ms. Whitfield's home telephone number. An additional call was placed to (205) 324-3124, one minute prior to a call being placed to Ms. Whitfield's actual home phone number. The following is a list of these calls, all of which lasted less than one minute:

| Date | Time | |
|------|------|--|
| April 10 | 7.06 p.m. | |
| April 10 | 8.14 p.m. | |
| April 10 | 8:16 p.m. | |
| April 17 | 4:35 p.m. | |
| August 11 | 7:32 p.m. | *call made to (205) 324-3124 |
| August 11 | 7:33 p.m. | |
| September 20 | 9.05 p.m. | |
| September 20 | 10:40 p.m. | |
| September 21 | 4:11 p.m. | |
| September 21 | 5:44 p.m. | |
| September 21 | 6:36 p.m. | |
| October 3 | 6.32 p.m. | |
| October 3 | 6:35 p.m. | |

3

October 5          2:50 p m

6  On December 19, 1995, a review of BPD police records developed two reports under the name Gloria D. Yelder. The first case #9503210680, and dated March 6, 1995, was a complaint submitted by Ms. Andrea Whitfield alleging "Harassing Communications" which occurred on March 1, 1995. The second report was also submitted by Ms. Whitfield on December 11, 1995, case #951241582 alleging that on March 8, 1995, she had been the victim of an assault. Both reports identified you as the suspect.

7. On January 11, 1996, I counseled you concerning the fact that complaints had been received about your conduct. I informed you that as a result of these allegations, an investigation had been initiated by the DIS Office of the Inspector General, which might result in disciplinary action. I also pointed out that the behavior described in this complaint was similar to the behavior described in a separate complaint forwarded by a Mr. Robert L. Holler, on May 11, 1995, and for which you were counseled by me on June 9, 1995. I explained to you that behavior of the nature described in these complaints adversely impacted the professional image of DIS and would not be tolerated. I also advised you that any further complaints regarding your conduct would be construed as a refusal on your part to comply with proper orders.

8. On February 1, 1996, you were interviewed by Ms. Howes and Mr. Zerylnick, concerning the information discussed above. You stated that you began to receive anonymous telephone calls in January 1995, advising you that Ms. Whitfield was seeing Mr. Green. You advised that, at that time, you and Mr. Green were involved in an exclusive relationship. You described an event in March 1995, wherein you and Ms. Whitfield had a heated discussion after you discovered her at Mr. Green's residence. You confirmed that Mr. Green and Ms. Whitfield accused you of being the author of the anonymous letters, which you denied. You also confirmed that the argument escalated, but only to the extent that you pushed Ms. Whitfield away when she poked you in the face with her finger. You flatly denied ever biting Ms. Whitfield. In your statement, you asserted that in July or August of 1995, someone slid an "Easter" card into your mail slot. The card was addressed to "Quinn" and bore the name "Andrea." You explained that Ms. Whitfield referred to Mr. Green by his middle name "Quinn." Also present in the envelope were several pictures of Ms. Whitfield and Mr. Green engaged in various sexual acts.

•  You acknowledged making three calls made between 7.06 p m. and 8.16 p m. to Ms. Whitfield's home on April 10, 1995, from the DIS cellular phone issued to you for official business. However, you stated that these calls were in response to a message left on your telephone answering machine bearing that number. You advised that because the message did not indicate the purpose of the call, you assumed it was work related and used your DIS cellular phone to return the call. You explained that you "routinely" use you home telephone number to receive messages for work related activities. You also advised that when you attempted to call the number back you could not get through. You recalled that on each occasion you reached an answering machine on the other end and choose not to leave a message because you did not know who to ask for

4

- You could not recall making a call to Ms. Whitfield's residence on April 17, 1995

- You stated that the call reflected on the Bell South statement, as having been made to          Ms
  Whitfield's number at 7:33 on August 11, 1995, was, again, in response to the number being left
  on your answering machine. As before, you did not speak to anyone because you received a
  recording.

  - Your statement offers no explanation for the call you placed only one minute prior, at 7:22
    p.m., on August 11, 1995, to a phone number which was one digit off of          Ms
    Whitfield's number.

  - You maintain that on August 11, 1995, you were unaware of Ms. Whitfield's home
    telephone number.

- Your statement offers no explanation for the two calls placed to Ms. Whitfield's home phone at
  9:05 p.m. and 10:40 p.m. on September 20, 1995, or the three calls placed on September 21, 1995,
  at 4:11 p.m., 5:44 p.m., or 6:36 p.m.

- Your statement asserts that on approximately September 22nd or 23rd, 1995, your answering
  machine received another call bearing Ms. Whitfield's number. You stated that when you returned
  this call on your DIS cellular telephone, you asked the man that answered if he had placed a call to
  your home and he provided a negative response.

- You also provided no explanation for the two calls placed from your DIS issued cellular phone to
  Ms. Whitfield's home at 6:32 p.m. and 6:35 p.m., on October 3, 1995, or at 2:50 p.m., on October
  5, 1995. You claim to have spoken with no one at Ms. Whitfield's home on either of these dates

9. On February 8, 1996, Mr. Oliver C. Whitfield, was interviewed regarding your statement that in
September 1995, you had a short conversation with a male when returning a call to Ms. Whitfield's
home. Mr. Whitfield stated that he is typically the only male in the house, and could not recall anyone
ever calling his house asking if he had recently placed a call to their number. However,
Mr. Whitfield advised that in 1995, he could not recall the exact dates, he did receive some call from a
female accusing his wife of "doing such and such" when she was not home.

10. On April 23, 1996, copies of the letters received by Ms. Whitfield, along with the ones received by
Ms. Whitfield's mother and Mr. Green, were submitted to the U.S. Army, Criminal Investigations
Laboratory (USACIL), Ft. Gillem, Georgia. USACIL were provided these letters, along with known
handwriting exemplars from yourself and Ms. Whitfield for forensic examination. USACIL's
handwriting analysis determined that "it is very unlikely" someone other than you wrote these three
letters.

11. When interviewed On April 4, 1996, concerning the results of the interviews with Mr. Whitfield and the handwriting analysis by USACIL, you maintained that you had nothing to do with the letters or the harassing telephone calls made to Ms. Whitfield's home.

12. Section 13A-11-8, of the Alabama Criminal Code, paragraph (b)(1) states:

> "*Harassing Communications.* --- A person commits the crime of harassing communications if, with intent to harass or alarm another person, he:
>
>> a. Communicates with a person, anonymously or otherwise, by telephone, telegraph, mail or any other form or written or electronic communication, in a manner likely to harass or cause alarm; or
>> b. Makes a telephone call, whether or not a conversation ensues, with no purpose of legitimate communication ..
>
> .. (2) Harassing communications is a Class C misdemeanor..."

DIS Regulation 11-752-R, "Disciplinary and Adverse Actions," paragraph 6f, states:

> "Employees shall discharge their assigned duties conscientiously; conduct themselves in a manner that will reflect credit of DIS and themselves; respect the administrative authority of those directing their work; and observe the spirit as well as the letter of the laws and regulations governing their conduct. DIS will not interfere unnecessarily in the private lives of its employees unless an employee's off duty conduct adversely affects that employees ability to discharge the duties and responsibilities of his or her position, or otherwise adversely affects the efficiency of the service. DIS does require that its employees be honest, reliable, trustworthy, and of good character, reputation, and unquestioned loyalty to the Federal Government and to the United States.

DIS Regulation 11-735, "Standards of Conduct," paragraph 4, subparagraph b, states:

> "DIS personnel shall avoid any action whether or not specifically prohibited by this regulation, which might result in...affecting adversely the confidence of the public in the integrity of the government."

6

DIS Regulation 11-735, paragraph 11, states:

"...a. Government property , facilities, and personnel shall be used only for official government business. This includes, but is not limited to, telephone calls...DIS personnel shall not use directly or indirectly, or allow the use of any government property, including property leased to the government, for other than official purposes...

. .c. Office telecommunications cover all information sending, receiving, and conference services (such as telephone, messages, data, video, and facsimile services) available in the office environment. All DIS personnel are responsible for using office telecommunication services for official use only. The term "official use" means service directly in support of government business or as otherwise approved by the DIS employee's immediate supervisor as being in the best interest of the government.

(1) DIS office telecommunication services are resources provided to conduct business directly in support of the government.

(2) DIS shall pay only for the official use of DIS telecommunication services.

(3) Where available and practicable, steps shall be taken to ensure user accountability (i.e., call verification, call restriction, other telecommunications service features)

(4) Employees who make unofficial use of DIS office telecommunication services are subject to appropriate disciplinary or adverse actions.

As recently as February 9, 1995, you acknowledged that you understood the provisions of DIS Regulations 11-752-R and 11-735 when you signed the D41HV semiannual briefing statement.

13. In your February 6, 1996, statement you advised that you used the cellular phone issued to you by DIS to call Ms. Whitfield's phone number on April 10, 1995, because you thought it was official business. I noted, however, that each of these three calls were placed after 7.00 p.m.. The records of your DIS issued cellular telephone reflect that from January 1995 to December 1995, only 12 calls were placed after 7:00 p.m.. Of these 12 telephone calls, two (2) were placed to (205) 787-8707, which is the home telephone number of Mr. Green, one (1) was placed to (205) 787-8045, which is your home phone number, one (1) was placed to (202) 251-8320, which belongs to a L. Howard, not further identified, one (1) was placed to (205) 768-2313 which is unlisted, and seven (7) were placed to (205) 323-3124, which, as previously stated, is the home number of Ms. Whitfield. I found your explanation regarding the calls placed to Ms. Whitfield's home from your DIS cellular telephone to be implausible and self serving. Considering the information provided by this review, I see little evidence to suggest that you ever, much less "routinely," utilized your DIS cellular telephone to conduct official business after normal duty hours. In fact, the evidence presented above overwhelmingly supports the conclusion that you were, at very least, using your DIS cellular telephone to conduct personal business.

7

Moreover, the frequency of calls made to Ms. Whitfield between April 1995 and September 1995, along with the late hour of those calls, provides preponderant evidence to suggest that you used a piece of Government equipment, entrusted to your care, to commit a Class C misdemeanor.

14. As a DIS Special Agent, you carry a badge and credentials, which identify you as a member of the law enforcement community. As such, you are expected to adhere to a high standard of conduct and personal integrity. Furthermore, as Special Agent, you have the highest degree of public contact afforded to any employee of DIS. In turn, your conduct has a direct effect on the opinions people form about this agency as a whole. You are expected to conduct yourself in such a manner as to not bring shame on the agency and, thus, discredit the organization's reputation and effectiveness. Much of your statement consisted of assertions that your difficulties with Ms. Whitfield and Mr. Green were strictly personal and DIS had no business interfering in your personal life. DIS recognizes that an employee is entitled to a personal life free from inspection by the agency. However, when personal conduct raises questions regarding an employee's judgment and integrity, and has the potential of adversely effecting DIS's effectiveness through unfavorable notoriety with a local law enforcement agency, DIS not only has the right, but an obligation, to intervene. As made clear in the Report of Administrative Inquiry:

- Your conduct has resulted in a complaint being received from a private citizen who knew you were employed as a Special Agent for DIS.

- Your conduct involved misuse of Government Property entrusted to your care

- When questioned about this misuse, rather than be forthcoming, you chose to concoct implausible excuses, or disavow any knowledge whatsoever.

- Your conduct has resulted in BPD, an agency with whom you and every other DIS Special Agent are required to liaison, identifying you as a suspect in two criminal incident reports.

Your conduct, as described above, has clearly failed to meet the standards DIS expects of its Special Agents, and is deserving of disciplinary action.

15. I have already counseled you twice in the recent past concerning your conduct and behavior, once on June 9, 1995, and the other on January 11, 1996. Furthermore, in June 1995, I was required to counsel you regarding improper use of Government property, when it was discovered that you were purchasing personal items with your Government issued credit card. Furthermore, I am extremely concerned over your lack of contrition and your inability to recognize that your behavior is leading you into trouble. It is apparent to me that my earlier counseling efforts were insufficient; therefore, I have decided to issue you this official Letter of Reprimand.

8

16. This official Letter of Reprimand will remain a matter of record to be filed in your Official Personnel Folder for a period not to exceed two years from the date you received it. You are warned that any further instances of the conduct described above, or any other misconduct on your part, may result in a proposal for more severe disciplinary action, up to and including your removal from Federal service.

17. If you are dissatisfied with this action, you have the right to request consideration of a formal grievance in accordance with the provisions of DIS Regulation 11-771, "Administrative Grievance System." Any such request should be directed to the Deputy Director (Resources), (V0900), 1340 Braddock Place, Alexandria, Virginia, 22314-1651. In order to be considered, your grievance must be 1) in writing; 2) submitted within 15 calendar days of your receipt of this letter; and 3) set forth the remedy you are seeking along with the basis for the grievance. If you have any questions regarding these procedures or your rights in this matter, please contact Mr. Roy Fredrikson of the Employee Relations and Training Division, DIS Headquarters, on (703) 325-9589.


PHILLIP D. BOWLING
Special Agent-in-Charge
Huntsville, Alabama
Investigative Field Office

Copy to: V4100
D4100
V4101-OPF
V0972

*Declined to acknowledge receipt. PDBowling*
*Copy provided.*

Receipt Acknowledged:

_____            _____
Signature                             Date

9

To:  Joe Sparkman. Team Chief

From:  Gloria D. Yelder, Special Agent

Reference:   Sparkman's statement dated 22 Jan 96 wrote.

I thought when I talked to you on 11 Jan 96, it was a
conversation between a supervisor and a co-worker.

I did say all the things you mentioned in your statement
except I did not say to you, "I wonder how I could have
harassed her by letters, since I did not sign anything."  I
never said that to you and I want this to be place on record.

*Gloria Yelder*
Gloria Yelder

JULY 16,1996

TO:       JOE SPARKMAN, TEAM CHIEF
          PHIL BOWLING, SAC

FROM:     GLORIA D. YELDER

RE:       COMPLAINT LETTERS I RECEIVED IN MAY, 1995

After receiving my entire investigation, I sat down and read all the information.

After reading the complaints from the spouse, Subject and Holler, I realized I never even talked to Holler.

The day I read the complaints, I was so upset from what had happened, I did not read the complaints carefully. And I was not given a copy of the complaints.

I talked to three people on one evening while TDY when I was conducting Subject's investigation. Subject's name was something like Simonton.

I talked to his spouse on two occasions. She never told me her husband was TDY to a classified location nor did she give me a telephone number to reach him as she stated in her complaint. We only talked about two minutes and I was never rude.

I guessed she contacted her husband and he called yelling at me. Subject stated that I wanted to obtain information from him. I only wanted to set up a Subject interview. After he did not want to do his interview, I told him I would give the case back to the agent handling it. There was no other information needed at that time. Another military person called my room and started yelling like subject did and I could not explain anything to him, do I did hang up the phone on him, but this was not Holler.

Holler stated I was rude to his subordinate when I contacted him on a TDY assignment. Subject contacted me, which he and I stated. I never knew where Subject was. Holler stated I then contacted him at the same TDY location. I never contacted Subject nor did I ever talk to Holler. Holler lied.

I ask that this complaint be re-examined because Holler lied on me.

*Gloria D. Yelder*
Gloria D. Yelder

DEPARTMENT OF DEFENSE - DEFENSE INVESTIGATIVE SERVICE

| | | |
|---|---|---|
| D15AX | REPORT OF INVESTIGATION | DATE: 09/20/96/264 |
| CCN: | 96192-DX0-1817-1E3 | |
| LEAD(S): | A:96240 | |
| STATUS: | RUC | |
| MADE BY: | S/A RHODES, STEVE S., 2875 | |

DISTRIBUTION:

COPY TO:

SUBJECT: YELDER GLORIA DEAN / DIS PERSONNEL
SEX: F   SSN: 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   DOB: 30 APR 54   POB: 01

WARNING: This document is the property of the Defense Investigative
Service.   Contents may be disclosed only to persons whose official
duties require access hereto.   Contents may not be disclosed to the
party(s) concerned without specific authorization from the Defense
Investigative Service.

INVESTIGATIVE RESULTS
THE RECORD CHECKS AND INTERVIEWS, AS APPROPRIATE, WERE FAVORABLE AND
INTERVIEWEES RECOMMENDED SUBJECT FOR A POSITION OF TRUST, UNLESS
OTHERWISE INDICATED.

OTHER
1.   Inquiry with Leslie L. Violette, Chief Employee Relations and
Training   Branch   Defense   Investigative   Service   Headquarters,
Alexandria, VA (DISHQ), disclosed that Subject has been issued a
letter of Reprimand, and is in the process of filing a grievance
requesting reconsideration of the letter.   Violette advised that no
records concerning Subject could be released until after Defense
Investigative Service Deputy Director Rene Davis-Harding makes a
decision to confirm or rescind the Letter of Reprimand (exact time
frame of decision unknown). (16 Sep 96)

******************** End of this document ***********************

| | | | |
|---|---|---|---|
| SSR | SSR | DSL | Page: 1 |

BRANCH A-K CASE CONTROLLER NUMBERS & TELEPHONE EXTENSIONS
April 8, 1991

OFFICE OF THE CHIEF
YEAGLEY, Trudy          622

| TEAM A  Rm 104 | CC# CHIEF | PHONE 206 |
|---|---|---|
| HORVATH, Ric | A1 | 662 |
| KING, Ruth | A2 | 178 |
| HARP, Lyndall | A3 | 169 |
| BOWERS, Nancy | A4 | 179 |
| MEADOWS, Brenda | A5 | 171 |
| PERKINS, Patrice | A6 | 172 |
| CUNNINGHAM, Pat | A7 | 173 |
| HACKLEY, David | A8 | 663 |
| MCCOMAS, John | A9 | 170 |
| WEBSTER, Dave | AO | 195 |
| WILDEERGER, Marge | | |

S/ASST  174

PIECHOWSKI, Geri        174/5/6
THOMAS, Irene

| TEAM E  Rm 107B | CHIEF | 220 |
|---|---|---|
| HART, Jean | B1 | 360 |
| DEPETRIS, Donna | B2 | 211 |
| MOORE, Lynn | B3 | 225 |
| MCMILLION, Philip | B4 | 362 |
| CREMEEN, Judith | B5 | 226 |
| BEAN, Marjorie | B6 | 661 |
| FOSTER, Thelia | B7 | 347 |
| CHASE, Mary | B8 | 227 |
| JOHNSON, Diane | B9 | 361 |
| GREENSFELDER, Mary | BO | 221 |
| BLAIR, Tina | | |

MCDOWELL, Joyce    S/ASST  228

228

THOMAS, Delores
SCHERRER, Mary

| TEAM D  Rm 107A | CHIEF | 212 |
|---|---|---|
| MIDDENDORF, Jerry | D1 | 217 |
| RODRIGUEZ, Felix | D2 | 216 |
| ROWELL, Susan | D3 | 209 |
| KUHLMAN, Julie | D4 | 210 |
| COATES, Doris | D5 | 208 |
| NORFOLK, Donna | D6 | 218 |
| JACOBS, Beth | D7 | 658 |
| CONWAY, Rita | D8 | 219 |
| BORTZ, Carmen | D9 | 659 |
| HOWETH, Sharon | DO | 348 |
| MCQUEEN, Irwin | | |

TETA, Judith    S/ASST  219

WOODS, Patricia        213/4/5
MARZANO, Lucy
MINOR, Angela

KELLER, Betty Lou   233

| TEAM E  Rm 101 | CC# CHIEF | PHONE 145 |
|---|---|---|
| BELL, Ann | E1 | 142 |
| FARIES, Patricia | E2 | 143 |
| WELSH, Gayle | E3 | 136 |
| PROVENZANO, Regina | E4 | 137 |
| COTEL, Jerry | E5 | 135 |
| TOLBERT, Harold | E6 | 146 |
| TAYLOR, Janet | E7 | 138 |
| FERNSLER, Debbie | E8 | 144 |
| FOWLKES, Glenyce | E9 | 482 |
| AIREY, Elaine | EO | 149 |
| CAREY, Christopher | | |

JACKSON, Verneice S/ASST  13

JOHNSON, Constance     139/40/4
WOZNIAK, Patricia
KEMMER, Shirley

| TEAM F  Rm 102 | CHIEF | 1 |
|---|---|---|
| SCULLY, Mig | FI | 1 |
| BURKE, Donna | F2 | 1 |
| MALINA, Sandy | F3 | 1 |
| LURZ, Edward | F4 | 1 |
| NOVOTNY, Eric | F5 | |
| CUFFIE, Mary | F6 | |
| GRAY, Linda | F7 | |
| MOAN, Helen | F8 | |
| JOHNSON, Stevie | F9 | |
| BURKINDINE, Rose | FO | |
| FEATHER, Christina | | |

BURNHAM, Irene    S/ASST

158/

HANSEL, Noreen
HUNTER, Pamela
LAFFIN, Betty

| TEAM G  Rm 106 | CHIEF | |
|---|---|---|
| MARTIN, Debbie | G1 | |
| SMITH, Yvette | G2 | |
| DENT, Mary Ann | G3 | |
| SWEZEY, Bob | G4 | |
| WILSON, Yvonne | G5 | |
| ROBUSTO, Cathy | G6 | |
| AKEHURST, Rose | G7 | |
| HOLTZMAN, Jay | G8 | |
| SCOTT, Linda | G9 | |
| PACE, Philip | GO | |

GRAMMER, Lisa    S/ASST

BITTORF, Emma          1
NOWAKOWSKI, Denise
GILMAN, Yvonne

Paragraph 9

Exhibit 12



**DEPARTMENT OF DEFENSE**
OFFICE OF FREEDOM OF INFORMATION
1155 DEFENSE PENTAGON
WASHINGTON, DC 20301-1155

OCT 2 3 2007

Ref: 07-FP-0075

Ms. Gloria Yelder
1807 Eufaula Avenue
Birmingham, AL 35208

Dear Ms. Yelder:

This is in response to your January 21, 2007, Freedom of Information/Privacy Act request. We received your request on February 1, 2007.

The Washington Headquarters Service, Human Resources Directorate provides the enclosed documents in response to your request. However, additional material that they located falls under the cognizance of the Defense Security Service and the United States Department of Justice. Accordingly, we sent that material to them at the addresses provided below, with the request that they respond directly to you. There are no assessable fees for this response in this instance.

Defense Security Service
Chief FOIA and Privacy
1340 Braddock Place
Alexandria, VA 22314-1651

Executive Office of United States Attorneys
Department of Justice
FOIA/Privacy Unit
Room 7300, 600 E. Street, NW
Washington, DC 20530-0001

Sincerely,

Will Kammer
Chief

Enclosures:
As Stated

Exhibit 14