# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

GLORIA D. YELDER,                    )
1807 Eufaula Avenue                  ) CIVIL ACTION NO:1:07-cv-01639 *RJL*
Birmingham, AL 35208                 )
                                     )
      Plaintiff,                  )
                                     )
                                     )
UNITED STATES DEPARTMENT             )
OF DEFENSE,                          )
ROBERT M. GATES,                     )
Secretary of Defense,                )
1000 Defense Pentagon                )
Washington, D.C. 20301-1000          )
                                     )
And                                  )
                                     )
DEFENSE SECURITY SERVICE             )
1340 Braddock Place,                 )
Alexandria, VA 22314-1651            )
                                     )
And                                  )
                                     )
WASHINGTON HEADQUARTERS )
SERVICES                             )
1155 Defense Pentagon                )
Washington, D.C. 20301-1155          )
                                     )
      Defendants.                 )

## PLAINTIFF'S AMENDED RESPONSE TO OPPOSITION TO DEFENDANT'S REQUEST FOR SUMMARY JUDGMENT.

1. Plaintiff has shown with convincing evidence and proof throughout her

filings to your Honor's court that summary judgment is not appropriate in

1

this case because there are still genuine issues and information that Plaintiff requested and she need.

2. Defendants have known about all the information regarding Plaintiff and they have used it to their advantage; whereas, Plaintiff has been unaware and unknowledgeable about the information regarding her.

3. Defendants have made excuses after excuses why the information is not releasable; why exemptions are necessary, why a confidential letter to Judge Ott about the government's position should be released and why Plaintiff could think that there is but one periodic reinvestigation, (PR), when in fact, defendants are well aware that there are two PRs.

4. But then Defendants states that they knew Plaintiff did not have all the information when she filed her EEO complaints or during the security clearance process.

5. Plaintiff was told she was well aware of the allegations of the alleged affair.

6. But Plaintiff never had an affair or alleged affair and only found out about the email about the alleged affair, three months after she was terminated.

7. There is no way Plaintiff can ever get due process without knowing the information regarding her security clearance.

8. Plaintiff request that Defendants' request for summary judgment be denied.

9. Plaintiff's plea and prayer to this Court that the defendants release the information that Plaintiff requested in her initial filing

10. Plaintiff includes the following sworn affidavit from her as well as exhibits which proves that there is genuine issues and summary judgment would not be appropriate in this case. (See Affidavit of Gloria D. Yelder and exhibits)

10. Plaintiff came only pray that your Honor's court will order the Defendants to release her records, so Plaintiff came finally get to the truth about her security clearance.

11. The refusal of Defendants to release all the information that caused the revocation of her security clearance and termination of employment has caused Plaintiff enormous pain and suffering.

WHEREFORE, Plaintiff requests that this Court:

(1) Declare that Defendants' refusal to disclose the records requested by Plaintiff is unlawful;

(2) Deny the Defendants' requests for exemptions because they should not apply in this case.

(3) Order Defendants to make the requested records available to

Plaintiff immediately.

(4)  Award Plaintiff its costs and reasonable attorney's fee in this action    as

provided by 5 U.S.C. § 552(a)(4)(E); and

(5)  Grant such other and further relief as this Court may deem just and

proper.

Respectfully submitted,

Gloria D. Yelder
*Pro se*
1807 Eufaula Avenue
Birmingham, AL 35208
(205) 613-6680

**DEFENDANTS SERVED VIA CERTIFIED MAIL:**

I, Gloria D. Yelder, hereby declare that on the _____16th_____ day of <u>April,</u>

<u>2008,</u> I mailed a copy of the answer to defendant's request for summary

judgment, Plaintiff's sworn affidavit and six exhibits, certified mail return

receipt, to the below listed Defendant.

_____


Michele Johnson
United States Attorney for the District of Columbia
501 Third Street, NW
Washington, D.C. 20530




Gloria D. Yelder
*Pro se*
1807 Eufaula Avenue
Birmingham, AL 35208
(205) 613-6680

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

GLORIA D. YELDER,                          )
1807 Eufaula Avenue                        )  CIVIL ACTION NO:1:07-cv-01639
Birmingham, AL 35208                       )
                                           )
          Plaintiff,                       )
                                           )
                                           )
UNITED STATES DEPARTMENT                   )
OF DEFENSE,                                )
ROBERT M. GATES,                           )
Secretary of Defense,                      )
1000 Defense Pentagon                      )
Washington, D.C. 20301-1000                )
                                           )
And                                        )
                                           )
DEFENSE SECURITY SERVICE                   )
1340 Braddock Place,                       )
Alexandria, VA 22314-1651                  )
                                           )
And                                        )
                                           )
WASHINGTON HEADQUARTERS )
SERVICES                                   )
1155 Defense Pentagon                      )
Washington, D.C. 20301-1155                )
                                           )
          Defendants.                      )


Affidavit of Gloria D.Yelder

I, Gloria D. Yelder, declare under oath and under the penalty of perjury that the foregoing statement is the truth, nothing but the truth and correct.

1. I was a special agent with the Department of Defense, Defense Security Service from September 1982 to August 12, 1998, when my security clearance was revoked and I was terminated from federal employment.

2. I was the only black agent in the Huntsville field office.

3. I was in the top five in productivity and I have the up most respect and integrity for my position as a special agent.

4. I had an excellent record until Phil Bowling became the Special Agent In Charge of the Huntsville Field Office. Bowling had so much power in the region, I knew no one would believe me and they did not.

5. I was so afraid of losing my job.

6. In January 1996, I was told by my first line supervisor, Joe Sparkman to report to the Huntsville field office the next day because a complaint had been lodged against me.

7. I asked Mr. Sparkman was it Mrs. Andrea Whitfield who filed the complaint. He said he did not know who filed the complaint.

8. Earlier that day, Mr. Alvin Green, a person Mrs. Whitfield and I both dated, told me that Whitfield had contacted my supervisor because she thought I was telling her husband about her affair with him, (Green).

9. When I arrived in Huntsville the next day, Mr. Bowling and Mr. Sparkman were both present. I asked the both of them who filed a complaint against me.

10. I was told by Mr. Bowling that the complaint was out of his hand because he had turned the complaint over to the DSS' Inspector General, (IG), Office.

11. Mr. Bowling gave me a counseling memo and told me to "leave these people alone." (See Memo of Counseling from Mr. Bowling as Exhibit 1.) But he never told me who the people were.

12. I assumed it was Mrs. Whitfield, since Mr. Green had told me she had contacted my place of employment.

13. In February and April 1996,, not February 1997 as indicated at number 11 in my amended complaint), I went to the Region office in Atlanta, Georgia, where I was interviewed by Linda Howe and Matt Zerylnick, agents for the IG.

14. I told my side of the story as truthful as I could. I was interviewed about four hours both times.

15. In July 1996, I was reprimanded by Mr. Bowling about my relationship with Mrs. Whitfield who had an extramarital affair with Mr. Green. I refused to sign the reprimand. I did appeal Mr. Bowling's reprimand.

16. In August 1996, I was interviewed by M. Dexter Jones for my periodic reinvestigation, (PR).

17. After my PR was conducted, in December 1996, I was asked to take a mental evaluation for the harassment of Mrs. Whitfield. I questioned the decision, but too no avail.

18. In February 1997, I submitted a memo to Washington Headquarters Services Consolidated Adjudication Facility through DSS, (WHSCAF), but no one ever contacted me from DSS or WHSCAF. (See Memo dated February 24, 1997 as Exhibit 2)

19. In December 1996, I filed a complaint with DSS' EEO and in March and June 1997, I filed a formal complaint, but too no avail.

20. In October 1997, my security clearance was tentatively revoked, pending the results of my Statement of Reasons, (SOR). Although my security clearance was tentatively revoked, I continued to conduct security clearances for DSS.

21.  In February 1998, after an unfavorable result from my SOR, my security clearance was revoked, pending my appeal to WHS Clearance Appeal Board, (WHSCAB).

22.  In April 1998, I had a hearing before the administrative law judge for the Defense Office of Hearings and Appeals, (DOHA).

23.  The judge recommended that the revocation of my security clearance be overturned and my security clearance be restored.

24.  Although the judge recommended that my security clearance be restored, some of the information that she wrote in her opinion, I knew nothing about nor did we talk about the information.

25.  WHSCAB did not accept the judge's decision because they reviewed all the information.  (See the Decision of WHSCAB as Exhibit 3.)

26.  In March 1998, through my attorney, I asked for all the information about my security clearance.

27.  In November 1998, three months after I was terminated, I received from DSS partial information under the freedom of information act.

28.  In that information was an email, which disclosed that I was having an affair with the spouse complaining to DSS.  This was the first time I ever saw or heard about this email or complaint.  (See Email dated December 1995 as Exhibit 4.)

29. When I received the email, I wrote to WHSCAB to find out who was the person I was supposedly having an affair with per my investigation.

30. The letter from WHSCAB disclosed that the information about the alleged affair as well as other information was a part of my investigation conducted by DSS. (See letter from Yelder and response from WHSCAB as Exhibit 5)

31. The PR that DSS gave me had no reference to information about me and an alleged affair, nude pictures as well as taped conversation.

32. The PR, case control number 96192-DXC-1812-1b3, "O" changed to "C" with ink had done of the above information. (PR as been previously submitted)

33. For the first time, in December 2004, through court papers in the United States District Court for the Northern District of Alabama, Birmingham, Al, I founded out that I was supposedly well aware of the allegations of an affair and the effects it played in the revocation of my security clearance and termination from employment.

34. At no time during the security clearance process while a special agent, DoD, (DSS, WHSCAF, DOHA, or WHSCAB) was I asked, interviewed, informed or shown any information about any allegations of an affair.

35. I was aware of the complaint from Mrs. Whitfield and someone telling her spouse about her affair. I was unaware about any allegations of an affair referencing me.

## TWO PERIODIC REINVESTIGATIONS

36. In 1996, all cases were automatically sent from the Personnel Investigation Center in Baltimore, Md.

37. PRs case control numbers were not typed by agents.

38. The only information typed was lateral leads to another office.

39. At the bottom of the front page, the agent who conducted the investigation initials would be at the bottom of the page.

40. The person who conducted my PR was M. Dexter Jones, (MDJ), not Robert A. Minchin, (RAM). (See excerpt of my PR as Exhibit 6)

41. PRs are assigned to controllers in a team, which are letters.

42. In my 1996 PR, there are two case controllers.

43. DX**C** and DX**O** are the two controllers.

44. "C" is one controller and "O" is the second controller.

45. The PR, CCN 96192-DXO-1817-1b3, "O" changed to "C" with ink was tampered with. There are no small letters in case control numbers.

MEMORANDUM OF COUNSELING                                    11 Jan 96

The counseling session on this date serves as official notice to
you that I have received complaints regarding your conduct. As a
result of the complaints, an investigation has been initiated by
the Office of Inspector General, DIS. Specific allegations pertain
to you making harassing telephone calls to several individuals as
well as composing letters with threats and insinuations regarding
their personal lives.

This incident directly correlates with the topics discussed during
our most recent counseling session on June 9, 1995. Your behavior
adversely impacts the professional image of the Defense
Investigative Service and will not be tolerated.

Any further complaints regarding your conduct will be construed as
a refusal to comply with proper orders. As a result of the pending
investigation, further action may be taken against you.


PHILLIP D. BOWLING
Special Agent-in-Charge, D41HV


S/A GLORIA D. YELDER
RECEIPT ACKNOWLEDGED


DEFENDANT'S
EXHIBIT
V3

Exhibit 1

LAW OFFICE

**JOHN F. KIZER, JR., L.L.C.**
NEW SOUTH FEDERAL SAVINGS BUILDING
215 NORTH TWENTY-FIRST STREET, 6TH FLOOR
BIRMINGHAM, ALABAMA 35203

JOHN F. KIZER, JR.
MARCO A. GONZALEZ

TELEPHONE (205) 324-1582
FACSIMILE (205) 326-3700

February 24, 1997

Ms. Susan B. Edenfield, Deputy Chief
Department of Defense
Washington Headquarters
1155 Defense Pentagon
Washington, D.C.   20301-1155

RE:  Gloria D. Yelder, SSN: 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, Special Agent, DIS

Dear Ms. Edenfield:

Please find enclosed a memorandum directed to you from our
client, Gloria D. Yelder. It is very important to Ms. Yelder that
this memorandum be directed directly to you. Would you kindly make
a copy of this memorandum a part of Ms. Yelder's official file.
Thank you in advance for your kind and considerate attention to
this matter.

Very truly yours,

John F. Kizer, Jr.

JFK,JR./lfw

Exhibit 2

ORANDUM FOR SUSAN B. EDENFIELD
EPUTY CHIEF, CONSOLIDATED ADJUDICATIONS FACILITY

THROUGH:  Mr. James Packett, Chief, Office of Security,
          Defense Investigative Service

From:  Gloria D. Yelder, SSN:  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, special agent, DIS

Subject:  Medical Evaluation


     Before giving an answer regarding a medical evaluation, I would
like to make a statement to be added as a part of my official record.

     The past 15 months has been extremely frustrating, (Dec 95 to Feb
'97).  For the first time since the inception of this matter some of the
bitterness is finally leaving.  The things that have happened in my
past, I cannot change.  This was a lesson well learned from every stand
point, my job as well as my trust in a person who I considered a friend.

     First, I have never harass Andrea Whitfield either by phone or by
correspondance and if anyone else, including DIS, wants me to say
otherwise I can't because I did not.  There was a problem between
Whitfield and me, but it had nothing to do with me harassing her.  The
problem I had with Whitfield was Alvin Green, a person we both dated.  I
trusted a man whom I thought was a special friend and now I am the one
paying for the friendship.

     As I read my reprimand I could not believe it.  I could not sign it
because this was so unfair.  Things were placed in the reprimand that I
was never asked about especially information Whitfield gave DIS in May
95.  I was even reprimand for being rude to a SMS Holler while I was in
Ft. Walton Beach, FL and I never even talked to him.

     Later as I began to read the IG report, it portrayed me as a fatal
attraction, rootless, psychopathic, crazy, sick liar.  This was far from
being the truth.  I felt the investigation was conducted with closed
ears and convicted minds.  Nothing what I should or would have said or
even done would have made a different.  Everything I said was taken out
of content or turned around to mean something else.

     When I finished reading the IG report, I was hurt.

     A week after the reprimand I wrote a rebuttal.  While I was waiting
for an answer, my PR started.  I felt so hurt and embarrassed because I
knew the investigator, Dexter Jones, who was conducting my PR.  I was a
very, very close and good friend with his co-worker, Raymond Thomas, as
noted in Curt Massey's statement from the IG inspection.  I could not
tell him the anymore details of my personal life.  I felt I was being

punished all over again. At that time I wanted to keep a little dignity and respect and that still applies now. I had poured my heart and soul including my personal life in the IG inspection.

In Feb 96, I tried to tell my side of the story as truthful as I could. Whitfield and I both dated Green from Aug 94 to Oct 95. I had only met Whitfield on two occasions, once in Mar 95 and once in Jan 96, both times at Green's home around 10:30 or 11:00 pm. Whitfield had seen me at a party in Jan 95. I found out later she purchased two tickets for Green and I to attend a party so she could see what I looked like. She and her husband also attended the party. Green and Whitfield told me this the first time Whitfield and I met. I told the investigators this in the first interview.

When I was asked about Whitfield's telephone number being on my government cellular phone, I answered the questions to the best of my ability. I could not understand those phone calls and I could not give an answer. When I received copies of the IG report and reprimand it stated in May 95, Whitfield stated she intended to hold DIS liable for having knowledge of me using DIS telephone facilities to engage in harassment. I do not know how Whitfield could have known I had a government cellular phone. I could not understand how Whitfild could have had some of the dates and times of the calls identiable to the dates and times of calls on the government phone. I could not understand why would she say my government phone instead of my personal phone. (Phil Kemp, my former supervisor and Curt Massey, my co-worker, can verify that I had a personal cellular phone long time before DIS issued us a phone. And I did use my personal phone for DIS business.)

In Aug or Sep 96, I was talking to my next door neighbor and her friend and they asked me what happened to Green. I informed them we were no longer seeing each other. They told me they saw Green and a woman at my house on at least two occasions, dates and times unrecalled. They also stated that they did not say anything because he was at my home on a regular basis. Later, I showed them a picture of Whitfield and they said that the picture looked like her. Green did have a key to my house while we were dating and that can be confirmed through my neighbors. After I found this out I confronted Green about the cellular phone and about Whitfield being in my house. I asked him why? I asked him what could I had ever done to him for him to do this to me. He gave me a half grin, turned his head and walked away. Green and I stopped dating in Oct 95, as indicated by Green, myself, and my reference Rosalind Rudolph Young. There were no more calls to Whitfield's number on the phone since that time. I always bring my phone into the house when I'm not using it.

In Apr 95, at my second interview, I was told that a handwritng report had been conducted on letters that Whitfield and Green supposedly had possession of. I was told that the handwriting expert was given

three months of my notes and the conclusion was there were indications I wrote these letters. I was told that Whitfield did not write the letters, but Whitfield did not give the handwriting expert three months of notes. The expert compared my handwriting to Whitfield's and stated that mine was more like the letters. At the end of the interview, I asked the investigator, "I know they did not tell you I wrote the letters!" She said no, it was not scientific like fingerprints.

In the first interview, I was asked if there were other women in Green's life. There were a lot of women in Green's life, including Whitfield. I told them I knew one person who had similar dealings with Whitfield, but I did not know her name, but a relative of Green knew her and I gave them the person name. Rudolph said she also told the investigator about the relative. Also the relative knew a lot about Whitfield and Green. But no one talked to her.

In the first interview I gave the investigators, some pictures of Green and Whitfield, which were left in my mailbox. One was Whitfield posing in a black nighty; one was Green and Whitfield posing together in his bed; and one was with Whitfield's mouth n Green's penis. The reasons I showed the pictures were if I wanted to destroy or harass Whitfield I could have done it a long time ago and also to show there was nothing Whitfield would not do. Those pictures were sent to me a long time ago, even while Green and I were dating. I don't think Whitfield or Green knew I had the pictures. I never told him.

No one in DIS ever asked or felt that it could be possible that Whitfield and Green were harassing me. When I first met Green in Aug 94 and later after the relationship was over on 19 Nov 95, my cars were vandalized at his home. The area where Green resides is not a high crime area, especially on both occasions when nothing was stolen out of the cars. I did not blame anyone. I did not know about Whitfield when the first incident happened. Even when I was receiving the anonymous telephone calls and letters, I did not blame anyone because I did not know who it could have been and to try to destroy someone's life without cause was something I did not want to do. It may not be reflected in the IG report, but I do have a conscious.

In Aug 96, after the IG inspection and PR investigation, Whitfield and a person identified as her sister, Arlene Johnson, went into a drug store in Birmingham, AL and took five packages of my family pictures from a store. I was in a lot of the pictures. Johnson is the sister who gave DIS a statement during the IG inspection. The case is still under investigation.

I received a call at my home to tell me Whitfield had a 1-800 number to my job and she could call DIS anytime she liked. I had to change my number to an unlisted number.

In Jul or Aug 96, I met Whitfield's two sister-in-laws, who do not have any loyalty to me, they stated Whitfield would do anything to keep Green. I talked to one of Green's neighbor, and I was told Whitfield harassed Green's wife, who died in 1992, in some of the same ways. I was told Whitfield and Green have been dating each other since 1989 and anyone who got into Whitfield's way she would get rid of them.

Why would I need to harass Whitfield. She is a married woman, I'm single, so I had nothing to fear from her. I told her to leave me alone.

In Dec 95, Whitfield's sister, Arlene Johnson, called me and told me her family, including Whitfield's husband and mother, knew about the affair Whitfield had with Green for at least the last five years. Johnson stated that Whitfield would stay away from home and children at least one or two nights at a time. She would not know where she was. She would not even call.

I have been an agent for 14 1/2 years. I never been or tried to be dishonest with DIS or anyone else. I have always tried to get along with everyone, including super*isors and co-workers. If you asked anyone who knows me, they will tell you that I have always thought about other people feelings.

I thought Green was my friend. I trusted him with my home, family and friends. I never would have thought he would have betrayed my trust like this.

I have been punished over and over again, first by myself and secondly by DIS for something I did not do. Whitfield and Green have both tried to destroy my life and they almost made it, but I survived. This was a lesson well learned.

All I ever asked for was a chance to be heard. I will take a medical examination, but it will not be for harassing Whitfield because I did not.

Thank you for being patient in my response.


Gloria D. Yelder

DEPARTMENT OF DEFENSE
WASHINGTON HEADQUARTERS SERVICES
1155 DEFENSE PENTAGON
WASHINGTON, DC 20301-1155

2 8 JUN 1999

(Clearance Appeal Board)

MEMORANDUM FOR MS. GLORIA YELDER, DEFENSE SECURITY SERVICE

VIA: CHIEF OF SECURITY, DSS

SUBJECT: Appeal of Department of Defense Security Clearance Revocation

This is in reply to your appeal of the revocation of your security clearance for access to classified information and eligibility for occupancy of a sensitive position.

The Clearance Appeal Board decides the appeals of unfavorable personnel security determinations for civilian employees of the Office of the Secretary of Defense and those agencies serviced by Washington Headquarters Services, including the Defense Security Service.

The Clearance Appeal Board has met and carefully reviewed the transcript of your personal appearance, the documents you provided during and following your appearance, and the recommendation of the administrative judge who conducted the appearance. We also reviewed all related case documents and any and all information reflecting favorably on your case. The Board was impressed by your years of service as a civilian employee of the Department of Defense and by your successful career as a Special Agent of the Defense Security Service. However, thorough consideration of your appeal reveals no information that significantly mitigates or refutes the personal conduct issue that was the basis of the revocation of your security clearance eligibility.

The Board views your repeated delays in agreeing to undergo a psychiatric evaluation when requested to by the Consolidated Adjudications Facility (CAF), and your failure to follow through with the evaluation arranged by a doctor of your own choosing, as refusal to cooperate with required security processing. Although you did undergo a psychiatric evaluation following your personal appearance, the Board considered the evaluation to be inadequate to resolve the issues in your case. The psychologist who conducted it did not have access to your investigative file and was unaware of the repeated improper conduct on your part which caused the CAF to request a psychiatric evaluation. It is clear from the evaluation report that you minimized these underlying issues in your interview with the psychologist.

The granting of a security clearance is a determination that an individual's reliability and trustworthiness are such that allowing access to classified information and occupancy of a sensitive position is clearly in the best interests of national security. Your refusal to undergo a

FOR OFFICIAL USE ONLY





EXHIBIT
39

Exhibit 3

underlying issues in your case makes such a determination impossible. The Clearance Appeal Board finds that reversal of the revocation would not be clearly consistent with the interests of national security, which is the paramount determinant. Therefore, the decision to revoke your Department of Defense security clearance and eligibility to occupy a sensitive position stands.

In the attached, sealed envelope is a copy of the transcript of your personal appearance, and a copy of the administrative judge's recommendation to the Clearance Appeal Board. If you have any questions regarding the meaning of this decision, or about the attached documents, I urge you to contact the DSS Security Office.

This letter is marked "For Official Use Only" to ensure its contents are not released to individuals who are not allowed access to it as part of their official duties.

R. G. De Ritis
President
Clearance Appeal Board

Received:

Ms. Gloria Yelder 15 Jul 98
(Date)

FOR OFFICIAL USE ONLY

*Telephone call from complaining Spouse*

u    :: John P. Edwards at [ISHQ7
ate:    12/13/95  10:33 AM
ubject: Request for Information (OIG#C95-098)
----------------------------------- Message Contents -----------------------------

  Mr. John S. Benson has requested an inquiry into a citizen's
  complaint that she was being harassed by S/A Gloria D.
  Yelder, D41HV w/duty stationat Birmingham, AL.  Apparently
  there is/was a relationship between Yelder and complainant's
  spouse.  If you have any pertinent info pls advise. Thanks.



*Spouse — name of spouse that complained.*

*Exhibit 4*



**DEPARTMENT OF DEFENSE**
**WASHINGTON HEADQUARTERS SERVICES**
1155 DEFENSE PENTAGON
WASHINGTON, DC 20301-1155

(Clearance Appeal Board)

1 1 JAN 1999

Ms. Gloria D. Yelder
1807 Eufaula Ave.
Birmingham, AL 35208

Dear Ms. Yelder,

This is in reply to your December 22, 1998 letter regarding the revocation of your Department of Defense security clearance.

Several of the questions you asked in your letter (# 1, 2, 3, 4, 6, 10, 13 and 14) deal with the content and processing of your investigation by the Defense Security Service (DSS). These questions should properly be posed to that agency and so I will not address them. In other questions (#5, 7, and 8) you ask why Washington Headquarters Services believed that a psychological evaluation was necessary, and why your security clearance was revoked. These issues have been discussed with you several times already, both telephonically and in voluminous correspondence. While it is clear and understandable that you do not agree with our explanations, it is also clear that any further attempts to explain them will be futile.

In question 1 you state that you would like the psychologist whom you hired for a psychological evaluation to look at the files, in order to "understand the nature of the issues" that raised concerns about your continuing security eligibility. You have now, as you did at the time of the evaluation, all of the files in question and are free to share them with the psychologist if you choose.

Question 15 states that page 15 of the Administrative Judge's recommendation is missing. Enclosed is another copy of that document. It turns out there is no page 15. The Judge's discussion concludes on page 14, and the last page was incorrectly numbered "16" rather than "15".

I hope that this addresses your concerns. I also hope that you understand that you have taken full advantage of the Department's due process procedures provided for a clearance revocation and there will be no further review of this matter.

Sincerely,

*Janet Thompson*

Janet E. Thompson
Director

Enclosure as stated
*w/o enclosure*
*gt.*



Exhibit 5

22 December 98


From: Gloria D  Yelder
1807 Eufaula Avenue
Birmingham, Alabama 35208

To: A. L. Papenfus, Director
    Department of Defense
    1155 Defense Pentagon
    Washington D. C. 20301-1155

Dear Mr. Papenus:

After just receiving new information about my investigation from Defense Security,
(DSS), help me clarify what I am accused of per your investigation dated 03 Oct 96.

   1.  Name all parties involved in an alleged affair?

   2.  Name the people I was alleged to have harassed?

   3.  Please list the acts that constituted , "the disturbing pattern of behavior
presented in the report", as per letters to Senators Shelby and Sessions.  In your 23
Oct 98, correspondence to me you used as an example:  letters and telephone calls.
What are the other harassing behavior?

   4.  Do you have any recorded tape of my voice harassing her?

   5.  What in the 03 Oct 96 report led Washington Headquarters Services to think
my judgment and mental state would cause a concern in the interest of national
security?

   6.  In the 03 Oct 96 investigation, does it talk about anyone posing in explicit
pictures?  If so, who is the people in the photographs?

   7.  As stated in your 13 Oct 98 communication, "At no time was a determination
made that your were unstable:, based on the above statement and the information
received from DSS, I am unclear as to the reason for revoking my clearance, even in
Oct 97.

   8.  What would make you ask me for a medical evaluation?  As you know this
woman was having an extramarital affair with my boyfriend, so what make her so
righteous and me so wrong.  I would think that with all the things this woman and

Exhibit 2


this man did to me, you would think that I was one special person. Even now, when WHS and DSS is not here to protect their reputation and with the explicit pictures still in my possession, I have not done anything to hurt either one of them at their jobs or in their homes.

9. I was an investigator too long to know, that as I said before I did not send any letters or telephone her about her affair, but if I did this would not cause my clearance to be revoked.

10. The timing of my revocation of my security clearance concerns me. There was a significant time lapse between Dec 95, when Ms. Whitfield contacted my supervisors until Feb 98, when my clearance was revoked. Without resolving what ever issues there were, I continued working, receiving an exceptional evaluation, four cash awards and I remained in the top three in productivity. It eludes me, as to how I was able to do all of this, and WHS and DSS revoked my clearance.

11. You stated to Senators Shelby and Sessions, that I did take the mental evaluation but the psychologist based her findings on my own report of the incident and the evaluation was inadequate to resolve the questions raised by my behavior. You went on to state that I did not correctly characterize for the psychologist the nature of the issues, which raised concerns about me continuing security eligibility. Since I was never told what the nature of the issues were, how could I explain them to the psychologist? For the benefit of the psychologist and mine, I would like for her to look at the files.

12. You also stated to Senators Shelby and Sessions, there was only one investigation used to revoke my security clearance. The security clearance I have is a good clearance. All of my references were asked about my mental state and none of them stated I had any mental problems. They also informed the investigator about this woman, Whitfield and my relationship with Green.

13. Why was I also asked to take a polygraph examination since I had proven that this woman was having an affair with my boyfriend? And also I received anonymous letters and telephone calls.

14 Who is the agent who conducted my investigation in my 03 Oct 96 periodic re-investigation?

15. Also please be advised that page 15 was missing from the judge's report.

I know you do not have to answer any of my questions. I feel that I was never given due process by DSS and WHS. Everyone in DSS and WHS took the word of Whitfield and Green and I, who was an agent for 16 years, had no credibility. I could accept all of this if it was true. I have been fired from my job and my reputation damaged. It is hard to explain in an interview why you were fired after

Exhibit 2

16 years of service and you have been labeled a person lacking in judgment and no one tells you the reason why.

Any assistance would be appreciated.  Thanks in advance.

Sincerely,

*Gloria D. Yelder*

Gloria D. Yelder

Exhibit 2

DEPARTMENT OF DEFENSE - DEFENSE INVESTIGATIVE SERVICE

REPORT OF INVESTIGATION                    DATE: 23 Aug 96/236

D41AT

CCN:        96192-DX4-1817-1b3
LEAD(S):    I:96194

STATUS:     RUC
MADE BY:    S/A M.D. Jones, 0041;0257
DISTRIBUTION:

COPY TO:

SUBJECT:  YELDER GLORIA DEAN /SPECIAL AGENT, DIS
SEX: F  SSN: 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  DOB: 30 APR 54  POB: 01 (ALABAMA)

WARNING: This document is the property of the Defense Investigative
Service. Contents may be disclosed only to persons whose official
duties require access hereto. Contents may not be disclosed to the
party(s) concerned without specific authorization from the Defense
Investigative Service.

INVESTIGATIVE RESULTS
THE RECORD CHECKS AND INTERVIEWS, AS APPROPRIATE, WERE FAVORABLE AND
INTERVIEWEES RECOMMENDED SUBJECT FOR A POSITION OF TRUST, UNLESS
OTHERWISE INDICATED.

EMPLOYMENT REFERENCES
1. Curtis A. Massey, Jr., Special Agent-Defense Investigative Service
(DIS), with three times weekly contact as friend and coworker from May
84 to Apr 92; biweekly personal and twice weekly telephone contact as
friend and coworker from Apr 92 to present, including once to twice
yearly social contact, provided information concerning a DIS
INVESTIGATION. He recommended Subject for a position of trust.

   DIS INVESTIGATION
   An investigation was conducted after a woman made allegations that
Subject was harassing her. They were both dating the same man. Subject
received a Letter of Reprimand (LOR) concerning the investigation. He
does not know all of the details. The situation has not affected
Subject's work.  (06 Aug 96)

FIMS2        RAM         RAM                             Page: 1

Exhibit 6